562 A.2d 720

The BOARD OF TRUSTEES OF the EMPLOYEES' RETIREMENT SYSTEM OF the CITY OF BALTIMORE et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE CITY.

Yale LUBMAN et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE CITY.

Nos. 95, 104, Sept. Term, 1987.

Court of Appeals of Maryland.

Sept. 1, 1989.

74

George A. Nilson (Lee Baylin, Piper & Marbury, on the brief) Baltimore, for appellants in *Appeal No. 95, Sept. Term, 1987.*

Douglas Foster (Martin S. Kaufman, Mid–Atlantic Legal Foundation, both of New York City and James R. Eyler, Stephen J. Hughes, Miles & Stockbridge, Baltimore, all on the brief), for appellants in *Appeal No. 104, Sept. Term, 1987.*

Melvin J. Sykes and H. Russell Frisby, Jr. (Matthew W. Nayden and Melnicove, Kaufman, Weiner, SMouse & Garbis, P.A. on the brief), Baltimore, for appellee in *Appeals Nos. 95 and 104, Sept. Term, 1987.*

*AMICUS BRIEF* of Baltimore Chapter of National Lawyers Guild, American Civil Liberties Union of Maryland, Maryland Chapter of the National Conference of Black Lawyers, Maryland Citizen Action Coalition, Pax Christi/Baltimore, the Archdiocese of Baltimore South Africa Coalition, The Baltimore Anti–Apartheid Coalition, The Johns Hopkins University Coalition for a Free South Africa Coalition, The Lutheran Community Center at Missiah, The Baltimore Emergency Response Network, The Homewood Friends Meeting, Neighborhoods Institute/Community Leadership Center, Baltimore Jobs with Peace, Nuclear

Free America, Central America Solidarity Committee, The Baltimore Local of the Democratic Socialists of America, the UMBC Anti–Apartheid Coalition, and Mankekolo Mahlangu Ngcobo, filed by David Norken, Eleanor Montgomery, C. William Michaels and Deborah Weimer on the brief all from Baltimore.

*Amicus Curiae* of Lawyer's Committee for Civil Rights Under Law in support of appellees, filed by Martin R. Gold, Robert P. Mulvey, Vicki F. Van Fleet and Gold, Farrell & Marks all from New York City and Conrad Harper, Stuart J. Land, Norman Redlich, William L. Robinson, Judith A. Winston and Gay J. McDougall, Washington, D.C., all on the brief.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ELDRIDGE, Judge.

These cases involve numerous challenges to two Baltimore City ordinances requiring that Baltimore City employee pension systems divest their holdings in companies doing business in South Africa.

The pertinent facts are as follows. The City of Baltimore maintains three employee pension systems: The Elected Officials Retirement System (E.O.S.), the Fire and Police Employees Retirement System (F. & P.), and the Employees Retirement System (E.R.S.). Each system is administered by a Board of Trustees,[1] which is responsible for ensuring that members and beneficiaries ultimately receive the benefits to which they are entitled. As of December 31, 1986, the total sum accumulated in the three systems was approx-

---

**1.** Although each system is independent and has its own Board of Trustees, the Trustees of the E.R.S. also serve as the Trustees of the much smaller E.O.S.

imately $1.2 billion.[2] Virtually all of these assets are invested in either equities or common stocks (40% to 50%), fixed income instruments (40% to 50%), or cash and short-term equivalents.

Under each system, members are entitled to specific future benefits (defined benefits). In addition, the systems include a "variable benefits" program, which provides additional benefits that depend directly on the rate of return on the funds. Under this program, if the rate of return in a given year exceeds 7.5%, then all of the excess between 7.5% and 10% goes toward the payment of additional benefits; in addition, if the rate of return exceeds 10%, then half the excess over 10% goes toward the payment of additional benefits while the City receives the other half.[3]

In 1986 the City Council of Baltimore passed, and on July 3, 1986, the Mayor of Baltimore signed, Ordinance No. 765, which amended Baltimore City Code (1976, 1983 Repl.Vol., 1986 Cum.Supp.), Art. 22, §§ (7)(a), (35)(a). Section 1(i) of the Ordinance provides that no funds of the E.R.S. or the F. & P. shall remain invested in, or in the future be invested in, banks or financial institutions that make loans to South Africa or Namibia or companies "doing business in or with" those countries.[4] Section 1(ii) of the Ordinance states that

---

**2.** The parties agreed that December 31, 1986, would be the date from which all calculations in this case would be made.

**3.** The variable benefit program does not provide for additional benefits on a one-time-only basis. Instead, the money dedicated to variable benefits is placed in guaranteed investment contracts, which are similar to annuities. Under these contracts, eligible beneficiaries receive a sum equal to a certain percentage of their defined benefits; they will continue to receive that sum, generally, for as long as they live. If money is available in subsequent years for the payment of further variable benefits, the new benefits are compounded with the benefits previously awarded. Thus, as the system continues to generate variable benefits, the amount of a beneficiary's variable benefits and, consequently, the amount of his total benefits will continue to increase.

**4.** Namibia or "South West Africa" is a territory that has been administered by South Africa since 1921. *See* 17 *Encyclopaedia Britannica*

entities doing business in or with South Africa, within the meaning of § 1(i), "shall be identified by reference to the most recent annual report of the Africa Fund entitled 'Unified List of United States Companies with Investments or Loans in South Africa and Namibia.' " [5] Section 3 of the Ordinance further stipulates that divestiture shall occur within a two-year period. That period began to run on January 1, 1987. *See* § 2(b). Section 2(d) empowers a Board of Trustees to suspend divestiture during this two-year period, provided that, before acting, the Board adopts a resolution. Under § 2(e), the Board, in adopting such a resolution, must find:

"(1) That the rate of return on the funds [is] substantially lower than the average of the annual earnings on the funds over the past five years, and

(2) That continued divestiture under this ordinance will be inconsistent with generally accepted investment standards for conservators of pension funds notwithstanding the intent of this ordinance, or

(3) That divestiture under the divestiture program will cause financial losses to the funds."

Finally, in § 2(f), the Ordinance specifies that, when adopting a suspension resolution, a Board must state in writing its standards and conclusions, and set forth the duration of the suspension; the period of suspension, how-

---

300 (15th ed. 1977). On December 14, 1988, South Africa signed an agreement providing for Namibian independence with elections to be held on November 1, 1989, and adoption of a new constitution several months thereafter. *The New York Times,* Dec. 14, 1988, at A14. The timetable for Namibia's transition to independence was set in motion on April 1, 1989, under the supervision of a United Nations Transitional Assistance Group. *The New York Times,* April 2, 1989, at A3. In this opinion, reference to South Africa will be deemed to include Namibia.

**5.** Similarly, § 1(iii), which is not expressly challenged in this case, provides that entities doing business in or with Namibia "shall be identified through correspondence with the United Nations Office of the Commissioner for Namibia and the United Nations Center for Transnational Corporations."

ever, may not exceed 90 days, and the two-year time period for divestiture is tolled during the suspension.

Apparently because Ordinance No. 765 by its terms applies only to the E.R.S. and the F. & P., it was unclear whether the E.O.S. was also required to divest. As a result, the City Council passed and the Mayor signed Ordinance No. 792, which amended Baltimore City Code (1976, 1983 Repl.Vol., 1986 Cum.Supp.), Art. 22, § 23(b), to provide expressly that the City's divestiture program applies to the E.O.S.[6]

As of November 1987, the two-year period for divestiture had not begun to run for the F. & P. and the E.R.S. For each quarter since the Ordinances' effective date, the Trustees of those systems have found, among other things, that the "rate of return on the funds [has been] substantially lower than the average of the annual earnings on the funds over the past five years." Thus, as for those systems, the divestiture program has been suspended for successive 90–day periods.

On December 31, 1986, the Trustees of each of the City's three employee pension systems, and two employee beneficiaries, filed this action against the Mayor and City Council of Baltimore, asking the Circuit Court for Baltimore City to

---

6. The Divestiture Ordinances represent the culmination of several years of legislative effort. In 1983 the City Council considered, but rejected, Bill No. 1608, which, like Ordinance No. 765, called for divestiture over a flexible, two-year time period. On September 23, 1985, the City Council unanimously adopted Resolution No. 42, which stated the City's intention immediately to proceed with the process of disinvestment. In addition, this Resolution called upon the Boards of Trustees of the City's Retirement Systems to submit an investment proposal designed to encourage businesses in which the City's pension funds were invested to improve conditions for their nonwhite employees in South Africa and to take other steps in opposition to apartheid. In response, on November 21, 1985, the Trustees adopted a resolution generally calling only for a ban on new investment in businesses that did not abide with the Sullivan Principles, a code of fair employment practices for businesses operating in South Africa. The Divestiture Ordinances resulted in part from the perceived inadequacy of the Trustees' November 21 resolution.

declare the Ordinances invalid. In support of this request, the Trustees contended: that § (1)(ii) of Ordinance No. 765 impermissibly delegates legislative power to the Africa Fund, a private entity; that the Ordinances unconstitutionally impair the obligation of the City's pension contracts with the systems' beneficiaries; that the federal Comprehensive Anti-Apartheid Act of 1986, Pub.L. No. 99-440, 100 Stat. 1086 (1986), preempts the Ordinances; that the Ordinances intrude on the federal government's exclusive power to conduct foreign policy; and that the Ordinances violate the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3. On January 9, 1987, four pension fund beneficiaries, raising related arguments, moved to intervene on the side of the Trustees.[7]

The Trustees moved for summary judgment.[8] After hearing argument on March 26, 1987, the circuit court denied the motion for summary judgment, finding it necessary first to determine facts concerning the Ordinances' financial impact. On April 6, 1987, the circuit court denied the motion to intervene.[9]

---

7. In a three count complaint, the applicants for intervention argued that the Ordinances intruded on the federal government's exclusive foreign policy power, violated the Commerce Clause, and violated the beneficiaries' property rights "under the 'taking' clause of the Fifth and Fourteenth Amendments."

8. The applicants for intervention also filed a "proposed" motion for summary judgment. The court stated that it would treat this motion and the supporting memoranda as an amicus brief if intervention were denied.

9. In reaching this decision, the court first held that the applicants did not have "an unconditional right to intervene as a matter of law" under Maryland Rule 2-214(a)(1), since, under a contrary ruling, "every pensioner or prospective pensioner of the City retirement systems (a staggering multitude) would have to be made parties...." The court then found no basis for intervention as of right under Rule 2-214(a)(2), concluding that the Trustees adequately represented the applicants' interests. Finally, the court denied permissive intervention under Rule 2-214(b), noting that additional counsel would cause delay and that the applicants could adequately present their views in an amicus brief.

During the trial, which took place between June 22 and July 10, 1987, the parties presented a large amount of highly technical evidence concerning the Ordinances' financial impact. Thereafter the circuit court filed an opinion and a declaratory judgment containing numerous findings and conclusions. The circuit court, based on the evidence of financial impact, held that "it cannot be concluded that the Ordinance[s] will impair the performance of the equity funds." [10] In reaching this decision, the trial judge discounted the parties' evidence detailing the performance of other South Africa free (S.A.F.) equity funds:

"Some have fared better than the unrestricted equity funds of the same money manager; some fared worse. Many did better than the [Standard & Poor 500 Index].[11] All the experts agreed, however, that the track records of these SAF funds is too short (less than three years) to be statistically significant."

Moreover, the court noted that "not one witness was able to express the opinion that the percentage return on the plaintiffs' equity investment will be reduced because of the Divestment Ordinance[s]."

The circuit court indicated that the Ordinances barred investments in 120 of the 500 companies on the Standard & Poor 500 (S & P 500). The court further recognized that these companies represent approximately 40% of the market capitalization of the S. & P. 500.[12] Thus, the court found that, under the Ordinances, the pension systems' portfolio will have more investments in relatively smaller companies whose stock prices tend to be more volatile. The court

---

10. The parties had agreed that the Ordinances would not affect the funds' fixed income investments.

11. The Standard & Poor 500, an index of approximately 500 stocks representing a cross-section of various sectors of the economy, is designed to reflect the movement of the market as a whole.

12. A corporation's market capitalization is equal to the number of shares outstanding multiplied by the price per share. The market capitalization of the S. & P. 500 is, therefore, the combined market capitalization of all corporations listed on that index.

stated, however, that this was not necessarily a disadvantage, reasoning that in the long run such stocks perform as well or better than larger companies' stocks.

The Trustees had attempted to show that the Ordinances would adversely affect their money managers' "active" style, which had proved very successful. Generally, this style emphasizes investments in certain sectors of the economy in an attempt to surpass rather than merely to duplicate the market's performance.[13] The circuit court found that, by eliminating some potential investments in certain sectors, the Ordinances would affect the active style. Nonetheless, the court deemed any interference to be insignificant, concluding that "adequate SAF [South Africa free] replacement stocks can be found for each sector, even though the SAF companies will be replacing larger companies."

The Trustees had also introduced evidence purporting to show that the Ordinances would diminish the quality of the pension systems' portfolio by requiring money managers to forego their "first choice." The circuit court disagreed, stating that "it is not axiomatic that the manager's second choice is inferior to the first." The court explained that money managers ordinarily invest in a limited number of companies with which they are familiar.[14] Thus, the court found that the Ordinances would merely require money managers to do additional research in order to locate adequate replacement stocks.

The court did find that the Ordinances would affect the Short Term Investment Fund (S.T.I.F.). The S.T.I.F. is a fund of very short-term investment paper that is pooled in a local bank with the funds of other owners and is issued to

---

**13.** Other forms of active management emphasize the application of certain criteria in the selection of individual stocks. Such criteria include yield and the ratio of price to book-value.

**14.** According to the Trustees, a money manager typically holds positions in from 40 to 60 companies. By contrast, the record shows that approximately 5,000 stocks are publicly traded.

meet immediate or short-term liquidity requirements. The Ordinances affect participation in the pooled S.T.I.F., since that fund invests in companies doing business in South Africa. As comparable substitutes may not be readily available, the pension systems' S.T.I.F. may be forced to increase its ratio of investments in lower-yielding obligations, such as Treasury Bills. Moreover, unlike the pooled S.T.I.F., most South Africa free S.T.I.F.s charge management fees. These two factors, the circuit court found, would result in a decreased annual return on the pension systems' S.T.I.F. of .75% or $900,000.

The court also found that the Ordinances require divestiture of 47% of the pension funds' equity portfolio and 10% of the fixed income portfolio. The parties agreed that replacing these holdings with S.A.F. investments would lead to some initial, one-time costs; however, they disagreed as to the extent of the costs.[15] The Trustees had attempted to prove that, in addition to "explicit" costs (such as broker's fees or commissions), transactions of this magnitude adversely affect stock prices and thereby result in additional, "implicit" costs. Noting that other experts reject this theory, the circuit court declined to credit the Trustees' evidence. In addition, the court accepted the City's contention that the cost of transactions that would have occurred absent divestiture should be subtracted from the total costs of divestiture. Consequently, the court fixed the initial cost of divesting the funds' equity and fixed income portfolios at $750,000.[16]

Finally, the court observed that, because of the smaller size of S.A.F. companies, divestiture will result in a larger

---

**15.** The Trustees' expert placed this figure at between $4.4 million and $5.5 million. According to the City's expert, the figure was only $540,000.

**16.** Of this sum, the court found that $500,000 was attributable to divestment of the equity portfolio and $250,000 was attributable to divestment of the fixed income portfolio.

volume of trading. This in turn, the court found, will cause an annual increase in broker's commissions of $300,000.

In summary, the trial court fixed the initial cost of divestiture at $750,000, or one-sixteenth of 1% of the funds' total value. In addition, the court calculated that the ongoing cost of divestiture is $1.2 million per year ($900,000 for the S.T.I.F. and $300,000 for additional commissions), or one-tenth of 1% of the funds' total value. The court reasoned further: "If the Pension Funds earn in excess of 10% (as has regularly been the case since 1984), the loss to the retirees is halved, since the City takes one-half of the excess earnings." Consequently, the court concluded that the initial cost to the systems' beneficiaries is actually only $\frac{1}{32}$ of 1% and that the ongoing cost is actually only $\frac{1}{20}$ of 1%.[17]

In light of the Ordinances' "minimal" effect and the "salutary moral principle" underlying them, the circuit court rejected the Trustees' impairment of contract argument.

The court upheld § 1(ii) of Ordinance 765, which provides that entities doing business in South Africa shall be identified by reference to the Africa Fund's "Unified List." The circuit court construed the ordinance to mean that "[t]he Unified List is merely a 'reference,' which the Trustees may accept or reject," and that "the Trustees are the final authority to determine whether a company is disqualified." Accordingly, the court held that § 1(ii) did not impermissibly delegate legislative power to a private entity. The trial judge also rejected the Trustees' other challenges to the

---

**17.** Specifically, the trial judge found that "nothing in the evidence suggests that the Ordinance[s] will in any way jeopardize the amount or payment of defined benefits." He further found that, even assuming the existence of a contractual right to variable benefits, "the extent of the impairment is without legal significance." As noted previously, *supra* n. 3, variable benefits that have already accrued but are payable in the future are funded by guaranteed investment contracts purchased from insurance companies. Thus, the Ordinances have no effect on these benefits.

**88**

Ordinances.[18]

The Trustees and the applicants for intervention both appealed to the Court of Special Appeals. On the parties' joint request, we issued a writ of certiorari to consider the important issues presented.

## I.

■ Initially, we shall address the denial of the motion by four pension fund beneficiaries to intervene on the side of the Trustees. In denying the motion, the circuit court ruled that the applicants were not entitled to intervene as a matter of right under Maryland Rule 2–214(a)(1) or (2), and ruled that they would not be granted permissive intervention under Rule 2–214(b).

We disagree that the applicants were not entitled to intervene as a matter of right under Rule 2–214(a)(2). Rule 2–214(a)(2) provides in pertinent part:

"Upon timely motion, a person shall be permitted to intervene in an action: ... (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties."

Plainly the applicants, as beneficiaries, "clai[m] an interest relating to the property ... that is the subject of the action." Moreover, a ruling upholding the Ordinances' validity would be res judicata in a separate action by the

---

18. Additionally, in a number of interpretive rulings, the circuit court held: (1) that the power to suspend the divestiture program permits new investment, during the period of suspension, in companies doing business in South Africa; (2) that the two-year time period for divestiture must be extended for a further time equal to the length of any valid period of suspension; (3) that the Ordinances do not limit the number of times that the Trustees can suspend divestiture; and (4) that the Trustees can order suspension at any time before the time limit has run, even if total divestiture has already occurred.

None of the parties has challenged these interpretative rulings.

applicants. Restatement (Second) of Judgments, § 41(1)(a) (1982). *See Ugast v. LaFontaine,* 189 Md. 227, 233, 55 A.2d 705 (1947) (judgment for constructive trustee was res judicata in subsequent action brought by beneficiaries of constructive trust). *See also Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 593–594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974). Consequently, the applicants are "so situated that the disposition of the action may as a practical matter impair or impede" their ability to protect their interests.[19] Indeed, the trial court in its opinion did not find otherwise.

The basis for the trial court's denial of intervention as of right was the court's conclusion that the Trustees adequately represent the applicants' interests.

In *Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 713, 351 A.2d 133 (1976), we pointed out that under the intervention of right provision of former Rule 208, the rule requires only that the representation by existing parties "may be inadequate." In *Maryland Radiological v. Health Serv.,* 285 Md. 383, 402 A.2d 907 (1979), which was also decided under former Rule 208, we adopted an "interest analysis" test to determine whether existing representation is adequate. Referring to the discussion in 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1909 (1972), Judge Digges for the Court explained that test as follows (285 Md. at 390–391, 402 A.2d at 911–912):

"First, these authors suggest the obvious: If the potential newcomer's interest is not represented or advocated to any degree by an existing party, or if the existing parties all have interests that are adverse to those of the proposed intervenor, he is unrepresented and, assuming compliance with the other provisions of Rule 208 a, inter-

---

**19.** We caution that, to show that the disposition of an action may as a practical matter impair or impede his ability to protect his interest, an applicant need merely show that he might be disadvantaged by the disposition of the action in which he sought to intervene; he need not make the additional showing that the disposition of that action would be res judicata as to him. *See Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 711–712, 351 A.2d 133 (1976).

vention should be permitted.... Second, if the applicant's interest is similar but not identical to that of an existing party, 'a discriminating judgment is required on the circumstances of the particular case, but he ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee.' *Id.* (footnote omitted). Third, if the interest of an existing party and an intervenor-applicant are identical, or if an existing party is charged by law with representing a movant's interest, 'a compelling showing should be required to demonstrate why this representation is not adequate.' "

Also, in both the *TKU* case, 276 Md. at 712, 351 A.2d at 138, and the *Maryland Radiological* case, 285 Md. at 388 n. 5, 402 A.2d at 910 n. 5, we pointed out that intervention decisions under Rule 24 of the Federal Rules of Civil Procedure serve as a guide to interpreting the Maryland Rule.

Because of his fiduciary duties to the trust's beneficiaries, a trustee is charged by law with representing the beneficiaries' interests. Consequently, in cases under Rule 24, F.R.Civ.P., courts often view the interests of a trustee and the beneficiaries as the same, conclude that the trustee will adequately represent the beneficiary's interests, and deny to the beneficiaries intervention as of right. *See, e.g., Heyman v. Exchange Nat. Bank of Chicago*, 615 F.2d 1190, 1194 (7th Cir.1980); *Peterson v. United States*, 41 F.R.D. 131, 133–134 (D.Minn.1966); *Kind v. Markham*, 7 F.R.D. 265, 266 (S.D.N.Y.1945). The cases recognize, however, that where there is a conflict between the interests of the trustee and beneficiaries, or when other circumstances exist whereby the representation by the trustee may be inadequate, the beneficiaries will be granted intervention. *See, e.g., Swift v. Swift*, 61 F.R.D. 595, 597–598 (E.D.N.Y. 1973); *Peterson v. United States, supra*, 41 F.R.D. at 134; *Federal Home Loan Bank v. Long Beach Fed. S. & L. Ass'n*, 122 F.Supp. 401, 435 (S.D.Cal.1954).

The trustees of a public pension system do not necessarily occupy precisely the same position as the trustees of a conventional private trust. It is true that, like ordinary trustees, the persons administering Baltimore's retirement funds are charged with fiduciary duties of loyalty and care toward the systems' beneficiaries. In the present case, however, the Trustees have obligations to the City as well. As to variable benefits, which are the only benefits affected by the Ordinances, Baltimore City receives one-half of the systems' excess earnings over 10%. Thus, with respect to these benefits, the City is a co-beneficiary. Moreover, in this case the Boards of Trustees are agencies of Baltimore City, which is the party opponent in this litigation. The Trustees are municipal officials with some responsibility to comply with the City's directives. In essence, the Trustees are prosecuting this lawsuit against their employer. The present case, therefore, is very different from an ordinary action brought on behalf of beneficiaries. In fact, it should be noted in this context that, during Baltimore's last mayoral election campaign, one of the issues between the candidates concerned the propriety of permitting the Trustees to prosecute an appeal in the present case. *See The Sun* (Baltimore), August 29, 1987, at 5A.

In light of the Trustees' peculiar role, we conclude that the beneficiaries' interests are "similar but not identical" to those of the Trustees. *See Maryland Radiological v. Health Serv., supra,* 285 Md. at 390, 402 A.2d at 912. In our opinion it is not sufficiently clear, under the facts of the present case, that the Trustees will adequately represent the applicants. The prospect that the Trustees might not ask the United States Supreme Court to review an unfavorable ruling in this Court is not entirely unlikely in light of past events. A decision not to seek Supreme Court review would adversely affect the applicants, who would be bound by our ruling.

Consequently, under these circumstances, we hold that the Trustees may not adequately represent the applicants' interests. Thus, the trial court erred in holding that the

applicants were not entitled to intervene as a matter of right under Rule 2–214(a)(2).[20]

When a trial court has erroneously denied a motion to intervene, the ordinary remedy is to reverse and remand the case so that the intervenor may present the evidence that he originally would have produced. *See, e.g., Citizens Coordinating Comm. v. TKU, supra,* 276 Md. at 714, 351 A.2d at 139. In the case at bar, however, the applicants took the position, during oral argument before us, that they do not desire a remand for this purpose. Rather, they only wish to have the status of parties in the present proceeding before this Court and for all future proceedings in the case, including the right to seek review in the United States Supreme Court. As a consequence, the circuit court's error does not require reversal. Instead, we shall exercise our authority under Rule 8–604(e) to modify the circuit court's judgment so as to grant the applicants' motion to intervene.

## II.

Section 1(ii) of Ordinance 765 provides that "[b]usiness entities doing business in or with the Republic of South Africa shall be identified by reference to the most recent annual report of the Africa Fund entitled 'Unified List of United States Companies With Investments or Loans in South Africa and Namibia.'" The Trustees contend that this provision constitutes an impermissible delegation of legislative power to a private entity.

The City agrees that if the Trustees are bound by the South Africa Fund Unified List, and with respect to Nami-

---

**20.** We are not persuaded that, because two beneficiaries have been named as co-plaintiffs, the interests of other beneficiaries are adequately represented. As the applicants point out (Brief at 52), "the prosecution and appeal of this action is being maintained under the authority and direction of the Trustees." It appears that the Trustees alone direct the conduct of the case and that the presence of the two beneficiaries as co-plaintiffs is largely nominal.

bia bound by the determinations of the United Nations' offices referred to in the Ordinances, then the Ordinances are unconstitutional (City's Brief, p. 31). The City, however, urges that the language of the Ordinances is ambiguous, and it points to the circuit court's construction of the Ordinance No. 765 which was as follows:

"The directive in the Ordinance that [corporations doing business in or with South Africa] 'shall be identified by reference to the most recent annual report' of the Africa Fund Unified List is merely a 'reference,' which the Trustees may accept or reject."[21]

Under the circuit court's construction, the City's argument continues, there is clearly no impermissible delegation of legislative power.

As the Court stated in *Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 413, 435 A.2d 747, 759 (1981), "[i]n the enactment of laws, the legislature acts in the exercise of a power conferred upon it by the people; it cannot validly redelegate its lawmaking authority to others." *See Md. Co-op. Milk Producers v. Miller*, 170 Md. 81, 88, 182 A. 432, 435 (1935); *Brawner v. Supervisors*, 141 Md. 586, 595–596, 119 A. 250 (1922); *Bradshaw v. Lankford*, 73 Md. 428, 430, 21 A. 66 (1891); *Fell v. State*, 42 Md. 71, 83 (1875); *Hammond v. Haines*, 25 Md. 541, 562 (1866). *See also Anne Arundel County v. Fraternal Order*, 313 Md. 98, 111, 114–115, 543 A.2d 841 (1988); *Maryland Cl. Emp Ass'n v. Anderson*, 281 Md. 496, 508–509, 380 A.2d 1032, 1039 (1977). This principle follows from the nature of representative democracy. Pursuant to Article XI-A of the Maryland Constitution, and as authorized by Maryland Code (1957, 1987 Repl.Vol.), Art. 25A, the Baltimore City Council has the sole power to enact local legislation for the people of Baltimore City. *Cheeks v. Cedlair Corp.*, 287 Md. 595,

---

21. The circuit court went on to point out that the Unified List itself stated that "this list should be used as a starting point for further investigation."

608–609, 415 A.2d 255 (1980).[22] Thus, in enacting legislation, City Council members generally have no authority to substitute the judgment of others for their own judgment. *Md. Co-op. Milk Producers v. Miller, supra,* 170 Md. at 88, 182 A. at 435; *Bradshaw v. Lankford, supra,* 73 Md. at 430, 21 A. at 66.

The principle of nondelegation, however, is not absolute. *See Bradshaw v. Lankford, supra,* 73 Md. at 430, 21 A. at 66. As this Court stated in *Department of Transportation v. Armacost,* 311 Md. 64, 72, 532 A.2d 1056, 1060 (1987), "[o]ur cases have long sanctioned delegations of legislative power to administrative officials where sufficient safeguards are legislatively provided for the guidance of the agency in its administration of the statute." Furthermore, the Court noted in *Price v. Clawns,* 180 Md. 532, 538, 25 A.2d 672, 675 (1942), that "[t]here are many instances in which authority is lodged in and permitted to private persons by the Legislature." *See, Portsmouth Stove and Range Company v. Mayor and City Council of Baltimore,* 156 Md. 244, 251–253, 144 A. 357, 360–361 (1929). Nonetheless, delegations of legislative authority to private entities are strictly scrutinized because, unlike governmental officials or agencies, private persons will often be wholly unaccountable to the general public. *See Group Health Ins. of N.J. v. Howell,* 40 N.J. 436, 445, 193 A.2d 103 (1963); *Fink v. Cole,* 302 N.Y. 216, 224, 97 N.E.2d 873 (1951); *Union Trust Co. v. Simmons,* 116 Utah 422, 427–428, 211 P.2d 190 (1949); Note, *The State Courts and Delegation of Authority to Private Groups,* 67 Harv.L.Rev. 1398, 1402 (1954).[23]

---

**22.** *See also, e.g., Maryland State Administrative Board of Election Laws v. Talbot County,* 316 Md. 332, 344–345, 558 A.2d 724 (1989); *Griffith v. Wakefield,* 298 Md. 381, 386, 388, 470 A.2d 345 (1984).

**23.** For example, in *Fink v. Cole, supra,* the New York legislature had vested the Jockey Club, a private corporation, with broad discretion to license owners, trainers, and jockeys at horse races in that state. The Court of Appeals of New York noted that the issuance of licenses is "essentially a sovereign power" and that the stewards of the Jockey

A number of cases have held that no impermissible delegation takes place when a legislature merely adopts a fixed standard promulgated by a private entity. *See, e.g., St. Louis, Iron Mt. & Southern Railway Co. v. Taylor*, 210 U.S. 281, 28 S.Ct. 616, 52 L.Ed. 1061 (1908); *Kingery v. Chapple*, 504 P.2d 831, 836 n. 13 (Alaska 1972); *City of Bakersfield v. Miller*, 64 Cal.2d 93, 97–98, 48 Cal.Rptr. 889, 410 P.2d 393, *cert. denied*, 384 U.S. 988, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966); *City of Warren v. State Const. Code Com'n*, 66 Mich.App. 493, 239 N.W.2d 640 (1976); *People v. Shore Realty*, 127 Misc.2d 419, 486 N.Y.S.2d 124 (1984); *Meyer v. Lord*, 37 Or.App. 59, 586 P.2d 367, 371 (1978); *Dudding v. Automatic Gas Co.*, 145 Tex. 1, 193 S.W.2d 517, 520 (1946). *But cf. Cawley v. Northern Waste Co.*, 239 Mass. 540, 132 N.E. 365 (1921).

The Ordinance in the present case, however, does not incorporate a fixed standard but a standard that is subject to periodic revision by the Africa Fund. Section 1(ii) of Ordinance No. 765 requires the Trustees to employ the "most recent annual report" of the Africa Fund's Unified List. Courts have frequently viewed the legislative incorporation of future changes or revisions in a standard promulgated by a private entity as an impermissible delegation of authority. *See, e.g., City of Tucson v. Stewart*, 45 Ariz. 36, 40 P.2d 72, 80–81 (1935); *Agnew v. City of Culver City*, 147 Cal.App.2d 144, 153–157, 304 P.2d 788, 795–797 (1956); *People v. Pollution Control Board*, 83 Ill.App.3d 802, 38 Ill.Dec. 928, 404 N.E.2d 352 (1980); *Gumbhir v. Kansas St. Bd. of Pharmacy*, 228 Kan. 579, 618 P.2d 837, 843 (1980); *State v. Crawford*, 104 Kan. 141, 177 P. 360 (1919); *Coffman v. State Board of Examiners in Optometry*, 331 Mich. 582, 50 N.W.2d 322, 326 (1951); *People v. Mobil Oil*

---

Club, who wielded that power under the law, were "neither chosen by, nor responsible to the State government," 302 N.Y. at 224, 97 N.E.2d at 876. Consequently, the court held that the delegation of licensing power to the Jockey Club was "such an abdication as to be patently an unconstitutional relinquishment of legislative power...." 302 N.Y. at 225, 97 N.E.2d at 876.

*Corp.,* 101 Misc.2d 882, 422 N.Y.S.2d 589, 592 (1979); *State v. Emery,* 55 Ohio St. 364, 370, 45 N.E. 319 (1896); *Hillman v. Northern Wasco County People's Util. Dist.,* 213 Or. 264, 323 P.2d 664, 674–675 (1958), *overruled on other grounds* in *Maulding v. Clackamas County,* 278 Or. 359, 563 P.2d 731 (1977); *Woodson v. State,* 95 Wash.2d 257, 623 P.2d 683, 685 (1980).[24]

On the other hand, courts have sometimes upheld legislative adoption of private organizations' standards which are periodically subject to revision, in limited circumstances such as where the standards are issued by a well-recognized, independent authority, and provide guidance on technical and complex matters within the entity's area of expertise. *See, e.g., Ex parte Gerino,* 143 Cal. 412, 419, 77 P. 166 (1904); *Colorado Polytechnic College v. State Board for Community Colleges and Occupational Education,* 173 Colo. 39, 476 P.2d 38, 42 (1970); *Rosenthal v. State Bar Examining Committee,* 116 Conn. 409, 165 A. 211, 214 (1933); *State v. Dee,* 77 So.2d 768 (Fla.1955); *Lucas v. Maine Com'n of Pharmacy,* 472 A.2d 904 (Me.1984); *Application of Hansen,* 275 N.W.2d 790, 796–797 (Minn.1978), *appeal dismissed,* 441 U.S. 938, 99 S.Ct. 2154, 60 L.Ed.2d 1040 (1979); *Appeal of Murphy,* 482 Pa. 43, 393 A.2d 369 (1978), *appeal dismissed,* 440 U.S. 901, 99 S.Ct. 1204, 59 L.Ed.2d 449 (1979); *State v. Wakeen,* 263 Wis. 401, 407–412, 57 N.W.2d 364, 367–369 (1953); *Potter v. New Jersey Supreme Court,* 403 F.Supp. 1036, 1040 (D.N.J.1975), *aff'd,*

---

**24.** The principle set forth in these cases does not apply to a delegation of a legislative power to another *governmental* entity. In our complex system of government, state and local as well as state and federal authority unavoidably intermesh. *See, e.g., Department of Transportation v. Armacost,* 311 Md. 64, 82–83, 532 A.2d 1056 (1987) (to maintain eligibility for federal funds, General Assembly conformed state law to requirements of federal Clean Air Act); *Price v. Clawns,* 180 Md. 532, 538, 25 A.2d 672 (1942) (statute making it a crime to ride railroad except in compliance with railroad's regulations dovetailed with federal statutes dictating substance of railroad's regulations). As a result, a legislature may ordinarily adopt a standard promulgated by another governmental entity, even if that standard is subject to modification by the other governmental entity.

546 F.2d 418 (3rd Cir.1976). These cases usually involve accreditation or similar programs by established professional organizations.[25]

We need not in the present case express agreement or disagreement with the specific holding in any of the above-cited opinions of our sister states concerning delegation to private entities. It is sufficient to point out, in light of the prior decisions of this Court and the cases generally throughout the country, that if the Trustees are bound by the determinations of the private entities listed in the Ordinances, there arises a serious question concerning the validity of the Ordinances under Article XI–A of the Maryland Constitution.

█ It is a settled "principle that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality." *Yangming Transport v. Revon Products*, 311 Md. 496, 509, 536 A.2d 633 (1988). *See, e.g., Craig v. State*, 316 Md. 551, 552, 560 A.2d 1120 (1989); *Heileman Brewing v. Stroh Brewery*, 308 Md. 746, 763–764, 521 A.2d 1225 (1987); *In re Criminal Investigation No. 1–162*, 307 Md. 674, 685, 516 A.2d 976, 982 (1986); *Davis v. State*, 294 Md. 370, 377, 451 A.2d 107, 111 (1982). We agree with the circuit court and the City that this principle is fully applicable to the Ordi-

---

**25.** In *People v. Pollution Control Board*, 83 Ill.App.3d 802, 38 Ill.Dec. 928, 404 N.E.2d 352 (1980), the court held invalid a statutory provision exempting from a noise control ordinance auto racing events sanctioned by, among others, a private group called the Association of Motor Sports. The court deemed the provision an improper delegation. In doing so, the court distinguished cases holding that bar applicants must graduate from American Bar Association-approved law schools (38 Ill.Dec. at 933–934, 404 N.E.2d at 357–358):

"[T]he State's interest in assuring qualified legal practitioners was commensurate with the A.B.A.'s interest in maintaining high standards among law schools.

\* \* \* \* \* \*

"The corporate purpose of the Association of Motor Sports is unrelated to the legislature's presumed intent [in enacting the exemption from the noise ordinance]. Therefore, we are not persuaded by the analogy to the ABA's law school approval process."

nances. As Judge Greenfeld pointed out for the court below, the language of the Ordinances, designating the South Africa Fund's Unified List as a "reference," is reasonably subject to the construction that the Trustees are not bound by the list. It is, in the words of the circuit court, "merely a 'reference' which the Trustees may accept or reject."

■ The circuit court's construction of the Ordinances, which we uphold, avoids casting substantial doubt upon their validity under the cases dealing with delegation of legislative power to private entities. The Trustees have cited no case, and we are aware of none, indicating that it is an impermissible delegation of legislative authority for a legislative body to direct a government agency to use a private entity's list merely as an advisory reference, with the agency being free to decline to follow the list.

Consequently, it is for Trustees to determine whether a particular company is doing business in South Africa. While the view of the South Africa Fund must be taken into consideration, the Trustees may reject that view with regard to any particular company.

The concept of "doing business" in a particular area involves a matter of degree. If viewed expansively, "doing business" would encompass even the most tangential contacts with South African entities. On the other hand, if construed very narrowly, "doing business" might signify only actual ownership or control of productive assets, such as mines or factories, in South Africa. Clearly, however, the City Council did not contemplate a definition so narrow as to frustrate the objectives of divestiture. Nevertheless, from the Ordinances' references to the Africa's Fund's and United Nations organizations' definitions, it is clear that the City Council sought a responsible standard, and did not wish to bar investments in firms "doing business" under the most expansive sense of that term. In other contexts, we have construed the statutory phrase "doing business" in a geographical area to mean doing a "substantial amount of

business" or engaging "in significant business activity" in that area. *See, e.g., Yangming Transport v. Revon Products, supra,* 311 Md. at 504–509, 536 A.2d at 637–640; *S.A.S. Personnel Consult v. Pat–Pan,* 286 Md. 335, 339–340, 407 A.2d 1139, 1142 (1979); *G.E.M., Inc. v. Plough, Inc.,* 228 Md. 484, 488–489, 180 A.2d 478, 481 (1962). In our view, this is the definition which the Trustees should utilize.

## III.

According to the Trustees and the beneficiaries, the Ordinances impair the obligations of the beneficiaries' pension contracts with the City, in violation of the Contract Clause of the United States Constitution, Art. I, § 10. We disagree.

## A.

In *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 151–152, 389 A.2d 350, 357 (1978), we reviewed the framework for determining if governmental action unconstitutionally impairs contractual obligations, saying:

"Consideration of a claim that particular governmental action invalidly impairs contractual obligations involves several steps. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 17–21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). First, it must be determined whether a contract existed. If that hurdle is successfully cleared by the claimant, a court next must decide whether an obligation under that contract was changed. Finally, if the second question is answered in the affirmative, the issue becomes whether the change unconstitutionally impairs the contract obligation, '[f]or it is not every modification of a contractual promise that impairs the obligation of contract under federal law. . . .' *City of El Paso v. Simmons,* 379 U.S. 497, 506–507, 85 S.Ct. 577, 582–583, 13 L.Ed.2d 446 (1965)."

*See State v. Good Samaritan Hospital,* 299 Md. 310, 318, 473 A.2d 892, 896, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984). *See also State v. Burning Tree*

*Club, Inc.*, 315 Md. 254, 271, 554 A.2d 366 (1989); *Chevy Chase Savings & Loan v. State*, 306 Md. 384, 416, 509 A.2d 670 (1986).

There is no doubt that, by establishing the pension systems, the City imposed contractual obligations on itself. Under Maryland law, pension plans create contractual duties toward persons with vested rights under the plans. *See, e.g., Archer v. Archer*, 303 Md. 347, 357, 493 A.2d 1074 (1985); *Lookingbill v. Lookingbill*, 301 Md. 283, 289, 483 A.2d 1 (1984); *Deering v. Deering*, 292 Md. 115, 124–128, 437 A.2d 883 (1981); *City of Frederick v. Quinn*, 35 Md. App. 626, 371 A.2d 724 (1977). Moreover, the Baltimore City Code expressly recognizes the existence of a contractual relationship, at least between the City and the members of the F. & P. and the E.R.S. Baltimore City Code (1976, 1983 Repl.Vol.), Art. 22, § 42.[26]

Since divestment does not alter the provisions in the law concerning the amount of benefits that a retiree is entitled to receive, the Ordinances do not directly change the City's pension contracts with the systems' beneficiaries. *Compare Maryland State Teachers Ass'n v. Hughes*, 594 F.Supp. 1353 (D.Md.1984), *aff'd*, No. 84–2213 (4th Cir. Dec. 5, 1985).

The Trustees argue, however, that the Ordinances indirectly change these contracts by modifying the manner in which the pension funds are invested.

---

**26.** Section 17(e)(ii) provides, however, that, notwithstanding § 42, any increase in variable benefits "shall not become an obligation of the City of Baltimore." As an alternate ground for his decision, the trial judge held that, by virtue of these sections, the beneficiaries could claim no contractual right to variable benefits. We disagree for two reasons. First, the above disclaimer simply recognizes that future variable benefits depend not on City contributions but on market performance. Second, according to the City Council's file memorandum on the variable benefits ordinance, the disclaimer was also designed to "protect the City from any liability if [the] Variable Benefit Fund ... does not have sufficient earnings to provide for previously awarded benefits."

The right to receive defined benefits was not indirectly changed. Judge Greenfeld expressly found that "nothing in the evidence suggests that the Ordinances will in any way jeopardize the amount or payment" of the defined benefits. That finding is supported by the evidence and cannot be deemed clearly erroneous under Rule 8–131(c).

■ The trial court did find that the initial and ongoing costs of divestiture may affect the pension systems' profitability and, as a result, may slightly diminish the level of future variable benefits.[27] Thus, in this respect, the Ordinances may indirectly change the City's obligation under its contracts with the beneficiaries. The cases, however, make it clear that an insubstantial change does not unconstitutionally impair the obligations of a contract. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); *Allied Structural Steel Co. v. Spaunaus,* 438 U.S. 234, 244–245, 98 S.Ct. 2716, 2722–2723, 57 L.Ed.2d 727 (1978); *Chevy Chase Savings & Loan v. State, supra,* 306 Md. at 416, 509 A.2d at 686.

The circuit court found that the initial cost of divestiture is one-thirty-second of 1% of the systems' assets and that the ongoing annual cost is one-twentieth of 1%. Based on these findings, which are not clearly erroneous, it follows that the circuit court was justified in concluding that the cost of the Ordinances to the retirement systems, and thus to the systems' beneficiaries in terms of future variable benefits, is so minimal that it does not approach the constitutional standard for impairment.[28]

---

**27.** As pointed out previously, the Ordinances have no effect on accrued variable benefits, which are funded by guaranteed investment contracts.

**28.** It should be noted that the circuit court's findings with regard to the effects of divestment seem to be premised upon divestment of holdings in all companies on the South Africa Fund's Unified List. At the same time, as discussed in Part II of this opinion, the circuit court held, and we agree, that the Trustees are not bound by the Unified List. Consequently, depending upon the Trustees' decisions concern-

## B.

▋ The Trustees further argue that the Ordinances indirectly change the pension contracts by disturbing the beneficiaries' expectations that benefits will be well secured. According to the Trustees, the beneficiaries are entitled to demand that the systems' funds "will be invested prudently for the exclusive benefit of the workers (and their beneficiaries) and for the sole purpose of securing the payment of promised future benefits." (Trustees' Brief, pp. 14–15). Thus the Trustees contend that the contracts incorporate the common-law duties of prudence and loyalty and that the Ordinances alter those duties.

We agree that the pension contracts incorporate the Trustees' common-law duties of prudence and loyalty. Moreover, we shall assume that if legislation substantially alters those duties, the legislation should be viewed as changing the obligations of contract. Nonetheless, in this case, the Trustees have not proven such change.[29]

As stated above, one of the common-law fiduciary duties is the requirement that trustees act prudently in managing trust affairs. *Shipley v. Crouse*, 279 Md. 613, 621, 370 A.2d 97 (1977); *Zimmerman v. Coblentz*, 170 Md. 468, 484, 185 A. 342, 349 (1936); *Johnson v. Webster*, 168 Md. 568, 576, 179 A. 831, 834 (1935); *Fox v. Harris*, 141 Md. 495, 506, 119 A. 256, 260 (1922); *Gilbert v. Kolb*, 85 Md. 627, 634–636, 37 A. 423 (1897); *Gray v. Lynch*, 8 Gill 403, 431 (1849);

---

ing what companies are doing business in South Africa, based on the standards set forth in Part II of this opinion, the costs of divestment could be somewhat lower than found by the circuit court.

**29.** There is very little case law with respect to whether divestiture conflicts with a trustee's duties to beneficiaries. In *Associated Students of the Univ. of Or. v. Oregon Inv. Council*, No. 78–7502 (Cir.Ct. Lane Co., Or. Jan. 21, 1985), *rev'd* 82 Or.App. 145, 728 P.2d 30 (1986), *petition denied*, 303 Or. 74, 734 P.2d 354 (1987), the trial court held that the trustees of a charitable trust need not comply with the University's divestment resolution, as divestment would violate the statutory prudent investor rule. The intermediate appellate court reversed on the ground that the plaintiffs lacked standing to challenge the trustees' actions. 82 Or.App. at 151, 728 P.2d at 33.

*Green v. Lombard,* 28 Md.App. 1, 5, 343 A.2d 905, 909, *cert. denied,* 276 Md. 743 (1975). The Court in *Shipley v. Crouse, supra,* 279 Md. at 621, 370 A.2d at 102 (quoting G. Bogert, *The Law of Trust and Trustees,* § 541 (2d ed. 1960), explained as follows:

" 'A trustee is required to manifest in all his management of the trust the care, skill, prudence, and diligence of an ordinarily prudent man engaged in similar business affairs and with objectives similar to those of the trust in question.' "

Likewise, Baltimore City Code, Article 22, §§ 7(h) and 35(h), adopt the duty of prudence set forth in § 404(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1104(a)(1) (1982) [30]:

"The Board of Trustees shall discharge its duties ... (2) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

The trustees argue that the Ordinances alter the duty of prudence by radically reducing the universe of eligible investments.

There is no doubt that the Ordinances place some limits on the scope of investment. Using the South Africa Fund's Unified List, the Trustees argue, for example, that they are barred from investing in almost one-half of the market capitalization of the S & P 500. In fact, the correct figure may be substantially smaller, as the Trustees are not bound by the South Africa Fund's determinations. Nevertheless, the Ordinances do exclude a not insignificant segment of the investment universe. *Cf.* Lanoff, *The Social Investment of Private Plan Assets: May It Be Done Lawfully Under ERISA?,* 31 Lab.L.J. 387, 391 (1980). The City,

**30.** As "governmental plans," the City's systems are exempt from ERISA. 29 U.S.C. §§ 1002(32), 1003(b)(1) (1982).

however, has shown that, under the divestiture program, economically competitive, substitute investments remain available.

Furthermore, the Trustees' emphasis on market capitalization is somewhat misleading.[31] While the Ordinances seem to ban investments in many larger companies with a high market capitalization, numerous opportunities remain available. Thus, under Judge Greenfeld's findings, the Ordinances permit the Trustees to construct an almost perfectly diversified portfolio, one that accurately matches the market as a whole in all respects except the size of the companies in which the pension systems invest. Moreover, the Trustees' inability to demonstrate that divestiture will impair the portfolios' equity performance indicates that a diversified, S.A.F. portfolio can be managed consistently with the duty of prudence. In fact, on cross-examination, the Trustees' witnesses conceded that, given a shift to "passive" management, the funds could duplicate the performance of a "target index," such as the S. & P. 500. Thus, divestiture does not imprudently increase risk or decrease income.

The Trustees' chief concern seems to be that, by foreclosing a certain range of investments, the Ordinances will adversely affect the money managers' active style. Yet, assuming arguendo that this is true, there is in our opinion no contractual right to a particular management style.[32]

---

**31.** For example, as the trial court observed, the market capitalization of IBM, a company apparently doing business in South Africa, is equal to that of the 200 smallest companies on the S. & P. 500.

**32.** While Judge Greenfeld concluded that the Ordinances would not significantly affect the active style, some proponents of divestiture disagree. *See* Dobris, *Arguments in Favor of Fiduciary Divestment of "South African" Securities,* 65 Neb.L.Rev. 209, 240 n. 285 (1986). One of the Trustees' witnesses did testify, however, that the Ordinances have only a minimal affect on certain active managers. These include "market-timers," who decide when to be in or out of the market, and "top-down managers," who first decide what types of stocks to buy and then fill out their portfolios accordingly.

The provisions regulating the divestiture program reinforce our conclusion that the Ordinances do not change the Trustees duty of prudence. The transition to an S.A.F. portfolio is to occur gradually, over a two-year period. The Ordinances expressly empower the Trustees to suspend the divestiture program at any time for up to 90 days if they find, in essence, that divestiture has become imprudent. *See* § 2(d), (e) of Ordinance No. 765. The parties do not dispute the circuit court's interpretive rulings that the two-year period is extended for the length of any valid suspension and that the Ordinances do not limit the number of times the Trustees can suspend the program. In addition, none of the parties has challenged the trial court's further rulings that, during a suspension, the Trustees may make new investments in companies doing business in South Africa and that the Trustees may order a suspension at any time before the time limit has run, even if total divestiture has already occurred. We agree with these interpretative rulings by the circuit court. In our opinion, there exist numerous safeguards which guarantee that divestiture cannot occur unless it would be consistent with the Trustees' duty of prudence.

## C.

In a related argument, the Trustees contend that the Ordinances alter the duty of prudence by mandating the consideration of social factors unrelated to investment performance. Under the circumstances of this case, we disagree.

No less an authority than Professor Austin Wakeman Scott rejected the proposition that "trustees are rigidly

---

In any case, a shift to passive management would hardly be imprudent. The Trustees admit that most active managers underperform the market. Moreover, one of the Trustees' experts conceded that passive management in the long run provides more stability, lower transaction costs, and lower risk than active management.

bound to attempt to secure the maximum return, whether as to income or principal, consistent with safety." III *Scott on Trusts*, § 227.17 (W. Fratcher 4th ed. 1988).[33] Instead, Professor Scott concluded (*ibid.*):

> "Trustees in deciding whether to invest in, or to retain, the securities of a corporation may properly consider the social performance of the corporation. They may decline to invest in, or to retain, the securities of corporations whose activities or some of them are contrary to fundamental and generally accepted ethical principles. They may consider such matters as pollution, race discrimination, fair employment, and consumer responsibility."[34]

For this position, Scott relied in part on an analogy to the corporate fiduciary's limited right to make charitable contributions: just as the directors may conclude that charitable contributions are in the corporation's long-term interests, so too a trustee "may well believe that a corporation that has a

---

**33.** This section, which initially appeared in the supplements to the third edition of the treatise, was authored by Professor Scott himself.

**34.** Similarly, in construing testamentary trusts, some have urged that social factors should override even the testator's express directives: For example, in the litigation concerning the desegregation of Girard College, a school established in Philadelphia in 1833 for "poor white male orphans," it was asserted that the testator's philanthropic designs would best be served by admitting male children of all races. *Commonwealth of Pennsylvania v. Brown*, 392 F.2d 120, 125 (3d Cir.), *cert. denied*, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); *Girard College Trusteeship*, 391 Pa. 434, 480–481, 138 A.2d 844, 866 (Musmanno, J., dissenting), *cert. denied*, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958). *See also* Clark, *Charitable Trusts, The Fourteenth Amendment and The Will of Stephen Girard*, 66 Yale L.J. 979, 990 (1957) (suggesting that the moral duty of trustees, who were agents of the city, to Philadelphia's two million citizens "was scarcely less than that to one dead testator"). Additionally, in *Matter of London*, 104 Misc. 372, 377–378, 171 N.Y.S. 981, 983–984 (1918), *aff'd*, 187 A.D. 952, 175 N.Y.S. 910 (1919), the Surrogate Court for New York County upheld an investment in war bonds at 3½% despite the testator's express command that the trustee should invest only in railroad bonds paying at least 4%. Noting that the nation was at war and needed the "undivided aid, support and loyalty of every citizen," the court hypothesized that the testator would have sanctioned this investment had he been alive. *Ibid.*

proper sense of social obligation is more likely to be successful in the long run than those that are bent on obtaining the maximum amount of profits." *Ibid.* "But," he continued, "even if this were not so, the investor, though a trustee of funds for others, is entitled to consider the welfare of the community, and refrain from allowing the use of funds in a manner detrimental to society." *Ibid.*

These views are consistent with the position that a trustee's duty is not necessarily to maximize the return on investments but rather to secure a "just" or "reasonable" return while avoiding undue risk. *King v. Talbot,* 40 N.Y. 76, 86 (1869); *Withers v. Teachers' Retirement System,* 447 F.Supp. 1248, 1254 (S.D.N.Y.1978), *aff'd,* 595 F.2d 1210 (2d Cir.1979); III *Scott on Trusts, supra,* § 227.3; Restatement (Second) of Trusts § 227 comment (e) (1957); Dobris, *Arguments in Favor of Fiduciary Divestment of "South African" Securities,* 65 Neb.L.Rev. 209, 232 (1986); Ravikoff & Curzan, *Social Responsibility in Investment Policy and The Prudent Man Rule,* 68 Cal.L.Rev. 518, 519 (1980). *Cf.* Troyer, Slocombe & Boisture, *Divestment of South Africa Investments: The Legal Implications for Foundations, Other Charitable Institutions, and Pension Funds,* 74 Geo.L.J. 127, 156–157 (1985). *But see* Langbein & Posner, *Social Investing and the Law of Trusts,* 79 Mich.L. Rev. 72, 99–104 (1980). As one commentator stated, a "trustee is under no duty to open a brothel in Nevada, where prostitution is legal, in order to maximize return to beneficiaries." Dobris, *supra,* 65 Neb.L.Rev. at 232. Thus, if, as in this case, social investment yields economically competitive returns at a comparable level of risk, the investment should not be deemed imprudent.

The Mayor and City Council of Baltimore were motivated to enact the Ordinances, in part, because the Trustees' prior investment practices offended a growing

number of the systems' beneficiaries and residents of the City. Moreover, given the vast power that pension trust funds exert in American society,[35] it would be unwise to bar trustees from considering the social consequences of investment decisions in any case in which it would cost even a penny more to do so. Consequently we conclude that if, as in this case, the cost of investing in accordance with social considerations is *de minimis*, the duty of prudence is not violated.[36] Accordingly, we hold that the Ordinances do not alter that duty.[37]

---

**35.** "In 1980, public and private pension funds totaled more than \$550 billion, owned more than 25% of all publicly traded stock, and controlled more than 40% of all debt capital in the United States." Troyer, Slocombe & Boisture, *supra,* 74 Geo.L.J. at 154 n. 98 (citing McCarroll, *Socially Responsible Investment of Public Pension Funds: The South Africa Issue and State Law,* 10 Rev.L. & Soc. Change 407 (1980–1981)). Similarly, in 1980 the United States Department of Labor projected that by 1995 private pension trust assets alone would total almost \$3 trillion. Lanoff, *The Social Investment of Private Plan Assets: May It Be Done Lawfully Under ERISA?,* 31 Lab.L.J. 387, 387 (1980).

**36.** We recognize that, in absolute terms, the costs of divestiture may be large. As Judge Greenfeld pointed out, however, the costs are *de minimis* when viewed in relation to the systems' total assets.

**37.** As noted previously, although the systems are exempt from ERISA, the Baltimore City Code incorporates ERISA's language concerning the duty of prudence. Several commentators have written that social investment is likely to violate ERISA. *See, e.g.,* Hutchinson & Cole, *Legal Standards Governing Investment of Pension Assets for Social and Political Goals,* 128 U.Pa.L.Rev. 1340 (1980); Lanoff, *supra,* 31 Lab. L.J. at 390. *See* Langbein & Posner, *Social Investing and the Law of Trusts,* 79 Mich.L.Rev. 72, 98–99 (1980). *But see* Ravikoff & Curzan, *Social Responsibility in Investment Policy and The Prudent Man Rule,* 68 Cal.L.Rev. 518, 528–536 (1980). Nonetheless, one of the Trustee's own witnesses, a money manager, conceded that his company did not believe that it violated ERISA by building and managing S.A.F. portfolios subject to the federal Act. He justified this belief by stating that substituting S.A.F. securities for other securities did not involve "taking unusual risks." Moreover, at the time of the ordinances' enactment, the City Council explicitly made the ERISA provisions subject to limitations and conditions prescribed elsewhere in Article 22. *See* Art. 22, §§ 7(h)(4), 35(h)(4). The Ordinances are such a prescribed limitation or condition.

## D.

Finally, the Trustees contend that the Ordinances alter their duty of loyalty, which is implicit in the pension contracts. We disagree that the Ordinances alter that duty.

Like the duty of prudence, the general duty of loyalty is well-established in Maryland law. *See, e.g., Goldman v. Rubin*, 292 Md. 693, 441 A.2d 713 (1982); *Gianakos v. Magiros*, 238 Md. 178, 208 A.2d 718 (1965); *Hughes v. McDaniel*, 202 Md. 626, 98 A.2d 1 (1953); *Mangels v. Tippett*, 167 Md. 290, 173 A. 191 (1934); *Diffenderffer v. Minder*, 3 G. & J. 311 (1831). Moreover, as with the duty of prudence, the Baltimore City Code incorporates ERISA's formulation of the trustee's duty of loyalty (Art. 22, §§ 7(h), 35(h)):

"The Board of Trustees shall discharge its duties ... solely in the interest of the members and beneficiaries and:

(1) For the exclusive purpose of:

(i) providing benefits to members and beneficiaries...."

The Trustees urge that, by requiring them to consider the interests of persons other than the beneficiaries and by requiring them to manage the systems for purposes other than providing benefits, the ordinances change this duty.

■ It is clear that the trustee's duty of loyalty extends beyond a prohibition against self-dealing and conflict of interest, two wrongs that are not present in this case. Even if the trustee has no personal stake in a transaction, the duty of loyalty bars him from acting in the interest of third parties at the expense of the beneficiaries. *See* Restatement (Second) of Trusts, § 170 comment q (1957); *Conway v. Emeny*, 139 Conn. 612, 621–622, 96 A.2d 221, 225 (1953); *In re Estate of Sedgwick*, 74 Ohio App. 444, 461, 59 N.E.2d 616, 624 (1944).

■ Nevertheless, we do not believe that a trustee necessarily violates the duty of loyalty by considering the social consequences of investment decisions. If, as in this case,

the costs of considering such consequences are *de minimis,* the trustee ordinarily will not have transgressed that duty.

Although Professor Scott termed the trustee's duty of loyalty "[t]he most fundamental duty owed by the trustee to the beneficiaries," IIA *Scott on Trusts, supra,* § 170, he clearly believed that that obligation could be reconciled with considering the ethical implications of the trust's investments. *See* III *Scott on Trusts, supra,* § 227.17. Our conclusion is consistent with that belief. Moreover, our opinion in this case is broadly consistent with the requirement, embodied in the Baltimore City Code, that the trustees act "solely in the interest of the beneficiaries," and "for the exclusive purpose ... of providing benefits." As Professor Scott recognized, under some circumstances trustees may well believe that, by investing in businesses with "a proper sense of social obligation," they will in the long run best serve the beneficiaries' interests and most effectively secure the provision of future benefits. *Ibid.*

Consequently, the Ordinances do not change the Trustees' duties of prudence and loyalty, which are implicit in the pension contracts.

For the foregoing reasons, we hold that the Ordinances do not unconstitutionally impair the obligation of contract.

## IV.

The intervenors argue that the Ordinances "violated their due process rights under the 'taking' clause of the Fifth and Fourteenth Amendments" (Intervenors' Brief, p. 40). The Intervenors reason that the initial and ongoing costs of divestiture will reduce the future earnings of the pension funds, consequently reducing the amount of variable benefits payable to the beneficiaries. Because of this reduction in the amount of variable benefits, according to the Intervenors, there has been "a confiscation by [the city] government" (*Ibid.*) and "the beneficiaries have been deprived of

their right to constitutional due process as their property has been taken without just compensation" (*id.* at p. 44).[38]

As previously pointed out, the Intervenors have a contractual right to receive both defined benefits and variable benefits. Moreover, the contractual right to receive these benefits constitutes property under Maryland law. *Deering v. Deering, supra,* 292 Md. at 122–128, 437 A.2d at 887–890. *See Archer v. Archer, supra,* 303 Md. at 356–357, 493 A.2d at 1079; *Lookingbill v. Lookingbill, supra,* 301 Md. at 286–290, 483 A.2d at 2–4.[39]

 The Intervenors' contractual right to receive benefits does not, however, give them a right to direct or control the investment of funds in Baltimore City's pension systems. Absent a provision in the law to the contrary, the beneficiaries of a public retirement system have no right to direct the investment of the systems' assets. *Withers v. Teachers' Retirement System, supra,* 447 F.Supp. at 1260 (the beneficiaries of a public retirement fund "have no entitlement to, or right to direct the retention of, the

---

**38.** The Intervenors' argument, as the quotation from their brief indicates, invokes both the Due Process Clause of the Fifth Amendment and the Just Compensation Clause of the Fifth Amendment. The substance of the argument, however, seems to be based on the Just Compensation Clause. Clearly no procedural due process argument is made. In addition, the intervenors do not appear to advance a substantive due process argument. To the extent that the intervenors might be making a substantive due process argument, it is without merit. *See generally, e.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–125, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978), affirming *Governor v. Exxon Corp.,* 279 Md. 410, 423–429, 370 A.2d 1102, 1110–1113 (1977). *Ogrinz v. James,* 309 Md. 381, 394–395, 524 A.2d 77 (1987); *State v. Good Samaritan Hospital,* 299 Md. 310, 325–326, 473 A.2d 892, appeal dismissed, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984).

**39.** The Constitution does not create property rights. Rather, such rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). *See also Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985).

particular assets that are held for investment purposes in the pension fund"); *Crown v. Patrolmen's Variable Supp. Fund Trustees,* 659 F.Supp. 318, 320 (S.D.N.Y.), *aff'd,* 819 F.2d 47 (2d Cir.1987). *See Tron v. Condello,* 427 F.Supp. 1175, 1189–1190 (S.D.N.Y.1976) (beneficiary "has a vested right in receiving his pension benefits, but not in regulating the investment policies set by the Legislature and the Retirement Board").

 If the earnings of the pension funds were sufficient to warrant the payment of variable benefits under the pension formula, and such payments were not made, the beneficiaries could reasonably argue they had been unlawfully deprived of a property right. There is no sound basis for the claim made in the present case, however, that the beneficiaries' property interest in future variable benefits is unconstitutionally "taken" whenever the City Council or the Trustees act in a way which might reduce the earnings of the pension funds.

As the Supreme Court stated in *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 224–225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986), quoting *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), its decisions under the Just Compensation Clause

"have eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case.... To aid in this determination, however, [the Court has] identified three factors which have 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'"

*See Chevy Chase Savings & Loan v. State, supra,* 306 Md. at 411, 509 A.2d at 684.

The economic impact of the Ordinances might be to deprive the beneficiaries of some variable benefits they would otherwise receive if the Ordinances were not in effect. The degree of this impact is, however, substantially reduced by "provisions in the Act that moderate and mitigate the economic impact." *Connolly v. Pension Ben. Guar. Corp., supra,* 475 U.S. at 225, 106 S.Ct. at 1026. The provision in the Ordinances allowing for the postponement of divestment, for example, and other provisions previously discussed, mitigate any adverse impact on the beneficiaries' variable benefits.

The Ordinances do not interfere with "distinct investment-backed expectations." *Connolly, supra,* 475 U.S. at 225, 106 S.Ct. at 1026. The Supreme Court has stated: "A reasonable investment-backed expectation must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), quoting *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980). Variable benefits are, as their name suggests, speculative and uncertain. Whatever diminution of variable benefits the Ordinances might cause cannot be said to interfere with a "distinct ... expectation." As the Court said in *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979),

> "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed on which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests."

Finally, the nature of the governmental action in this case does not involve the government appropriating the beneficiaries' money for its own use or for the use of others. Government regulation under "a public program that adjusts the benefits and burdens of economic life to promote

the common good ... does not constitute a taking requiring Government compensation." *Connolly v. Pension Ben. Guar. Corp., supra,* 475 U.S. at 225, 106 S.Ct. at 1026. The Ordinances here do just that. Any reduction in variable benefits is an incidental cost of the City government's efforts to promote the common good by regulating its own investment policy.

We conclude that the Ordinances do not effect a "taking" of the beneficiaries' property in violation of the Fifth Amendment.

## V.

We next address the contention that the Comprehensive Anti–Apartheid Act of 1986, Pub.L. No. 99–440, 100 Stat. 1086 (1986), codified in relevant part at 22 U.S.C. §§ 2151, 2346(d), 5001–5116 (Supp. IV 1986), preempts the Ordinances.[40] Among other things, the federal Act prohibits new American investment in South Africa; prohibits the importation of certain South African products, including krugerrands, uranium, and coal; forbids the export of computer technology to the South African security forces; limits American loans to the South African government; and restricts nuclear trade with South Africa. *See* 22 U.S.C. §§ 5051–5060. In addition, the federal statute requires American businesses with more than 25 employees in South Africa to comply with the Sullivan Principles, a code of fair employment practices for companies operating in South Africa. 22 U.S.C. §§ 5034–5035. Section 5061 provides for the termination, modification, or suspension of the above sanctions if the South African government makes progress towards abolishing apartheid. Conversely, § 5091 autho-

---

**40.** Amendments to the Comprehensive Anti–Apartheid Act of 1986 have been introduced in both the House (H.R. 21, 101st Congress, 1st Sess. (1989)) and Senate (S. 507, 101st Congress, 1st Sess. (1989)). These amendments, if enacted, would prohibit any United States entity from purchasing or holding investments in South Africa under most circumstances.

rizes more stringent sanctions if such progress fails to occur.

 Federal law may preempt state or local law in different ways.[41] Congress may preempt state law by expressly stating its intention to do so. *California v. ARC America Corp.,* —— U.S. ——, ——, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989); *Hillsborough County, Fla. v. Auto. Med. Labs.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). The Anti-Apartheid Act of 1986 does not expressly preempt state and local divestiture laws. Absent express preemption, a court may infer a congressional intent to preempt from a scheme of federal regulation sufficiently comprehensive to occupy a given field or to make clear that Congress left no room for supplementary state legislation. *California v. ARC America Corp., supra,* 109 S.Ct. at 1665; *Pacific Gas & Electric v. Energy Resources Comm.,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Moreover, even if Congress has not completely preempted state regulation in a particular area, state law is preempted to the extent that it actually conflicts with federal law. *California v. ARC America Corp., supra,* 109 S.Ct. at 1665. "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility' ... or when state law 'stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.'" *Hillsborough County, Fla. v. Auto. Med. Labs., supra,* 471 U.S. at 713, 105 S.Ct. at 2375.

 Nevertheless, so as not to place undue restrictions upon state sovereignty, preemption is not lightly presumed. *California Federal Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Mary-*

---

**41.** "[F]or purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of state laws." *Hillsborough County, Fla. v. Auto. Med. Labs.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

*land v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 132, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978), *affirming* 279 Md. 410, 370 A.2d 1102 (1977). Furthermore, in areas traditionally regulated by state and local governments, there is a strong presumption against finding federal preemption. *California v. ARC America Corp., supra,* 109 S.Ct. at 1665; *Hillsborough County, Fla. v. Auto. Med. Labs., supra,* 471 U.S. at 716, 105 S.Ct. at 2376; *Pacific Gas & Electric v. Energy Resources Comm., supra,* 461 U.S. at 206, 103 S.Ct. at 1723; *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). In these circumstances there must be compelling evidence of congressional intent to preempt. *San Diego Building Trades Council v. Garmon, supra,* 359 U.S. at 244, 79 S.Ct. at 779.

 Baltimore City's regulation of investments by its employees' pension funds is clearly a matter of traditional local regulation. Therefore, the Ordinances enjoy a strong presumption that they are not preempted. The evidence with respect to congressional intent is wholly inadequate to overcome this presumption.

The relevant legislative history begins [42] in 1985, when the Senate was considering legislation (S.B. 995 and H.R. 1460, known as the Anti–Apartheid Act of 1985) which would have imposed economic sanctions on South Africa.[43] During the debates on the 1985 legislation, Senators Roth and McConnell had circulated an amendment that would have added express preemptive language; however, "in the face of certain defeat," the proponents of preemption elect-

---

**42.** In fact, the examination could begin as early as 1984, when Congress declined to exercise its plenary powers over the District of Columbia to disapprove of that City's divestiture ordinance.

**43.** On September 9, 1985, the President promulgated an executive order incorporating most of the economic sanctions contained in the then pending legislation. Exec. Order No. 12532, 3 C.F.R. 387 (1984–1987). No further action was taken on the bill.

ed not to submit the amendment. *See* 132 Cong.Rec. S 12533 (daily ed., Sept. 15, 1986) (Remarks of Sen. Kennedy); 131 Cong.Rec. S 18331 (daily ed., July 11, 1985) (Remarks of Sen. Kennedy).[44]

In 1986 the preemption debate in the Senate centered around the so-called "D'Amato Amendment," which concerned state and local legislation barring the award of state and local government contracts to companies doing business in South Africa. As originally drafted, the D'Amato amendment would have exempted such legislation from the requirement that contracts using federal funds must be awarded to the lowest bidder. 132 Cong.Rec. S 9305 (Remarks of Sen. D'Amato); *id.* S 9306 (Remarks of Sen. Moynihan).[45] On the final day of debate, Senator Lugar announced his opposition to the amendment, claiming (132 Cong.Rec. S 11817 (daily ed., Aug. 15, 1986) that the Anti-Apartheid Act preempted such local legislation and that the amendment "muddie[d] the water with regard to the preemption issue." [46] With little further discussion, the Senate

---

**44.** In withdrawing the amendment, Senator Roth took the position that the unamended bill would preempt state law. 131 Cong.Rec. S 18835 (daily ed., July 11, 1985). *See also id.* (Remarks of Sen. Lugar). Notwithstanding these assertions, however, many Senators had expressly opposed the Roth–McConnell amendment and taken the position that the bill should not preempt state law. *See, e.g., id.* S 18331 (Remarks of Sen. Kennedy); *id.* S 18330 (Remarks of Sen. Pell); *id.* S 18224 (Remarks of Sen. Cranston); *id.* S 18787 (Remarks of Sen. Hart); *id.* S 18784 (Remarks of Sen. Proxmire).

**45.** Anti-apartheid procurement legislation purported to prevent the award of a contract to the lowest bidder if that party did business in South Africa. As a result, the United States Department of Transportation had withheld millions of dollars in funds from jurisdictions that enforced the legislation. The original D'Amato Amendment would have permitted these jurisdictions to enforce their anti-apartheid laws without losing federal funds, provided the jurisdictions agreed to pay for any resulting increase in cost. *See* 132 Cong.Rec. S 9305 (daily ed., July 17, 1986) (Remarks of Sen. D'Amato).

**46.** Senator Kennedy's later remarks suggest that no Senator had previously raised the preemption issue during the 1986 debates. *See* 132 Cong.Rec. S 12533 (daily ed., Sept. 15, 1986). He also found it "curious" that Senator Lugar did not raise this issue until a unani-

rejected the amendment. Yet immediately thereafter, Senator D'Amato introduced a compromise measure, which was adopted by unanimous consent, *id.* at S 11818, and became § 5116 of the Act. That section provides:

> "Notwithstanding section 210 of Public Law 99–349 or any other provision of law—
>
>> (1) no reduction in the amount of funds for which a State or local government is eligible or entitled under any Federal law may be made, and
>>
>> (2) no other penalty may be imposed by the Federal Government,
>
> by reason of the application of any State or local law concerning apartheid to any contract entered into by a State or local government for 90 days after [October 2, 1986]."

It is apparent that, by its own terms, § 5116's preemptive effect, if any, is limited to state or local procurement legislation which, as applied, might cause a federally funded contract not to be awarded to the lowest bidder. As Professor Tribe observed in a memorandum to Congress, "[t]his leaves the negative implication that investment decisions are not preempted, nor are disbursements not using federal funds." *Memorandum on the Nonpreemptive Effect of the Comprehensive Anti–Apartheid Act of 1986 Upon State and Local Measure,* 132 Cong.Rec. S 12534, 12535 (daily ed., Sept. 15, 1986) (*"Tribe Memorandum"*). In fact, it would be unnecessary to penalize states or localities for applying their own laws if the Anti–Apartheid Act had already invalidated those laws. Consequently, if Congress had intended to preempt state or local anti-apartheid legislation, § 5116 would be superfluous. Thus, despite Senator Lugar's comments, it is hardly clear that the Senate intend-

---

mous consent agreement governing debate effectively prevented most further amendments. *See id.*

ed to preempt state or local divestment legislation.[47]

Moreover, the proceedings in the House of Representatives provide strong evidence that Congress had no intent to preempt. House Resolution 549, which was passed by an overwhelming margin at the same time as the Anti–Apartheid Act, declared that the House intended that the Act not preempt state or local law. The Resolution provided in part:

> " 'Resolved, That in passing the bill, H.R. 4969, as amended by the Senate, it is not the intent of the House of Representatives that the bill limit, preempt, or affect, in any fashion, the authority of any State or local government or the District of Columbia or of any commonwealth, territory, or possession of the United States or political subdivision thereof to restrict or otherwise regulate any financial or commercial activity respecting South Africa.' " [48]

In addition, while speaking in support of the Resolution, numerous Representatives expressed their understanding that the federal statute had no preemptive effect. 132 Cong.Rec. H 6757–6767 (daily ed., Sept. 12, 1986) (Remarks

---

**47.** "If a few legislators could insert calculated snippets of legislative history and thereby instruct the courts to regulate the finances of states and cities, they could circumvent the need to articulate that scheme of regulation through the usual legislative process." *Tribe Memorandum, supra,* 132 Cong.Rec. at S 12535. Moreover, Senator Lugar's comments must be balanced against those of Senator Kennedy, the Anti–Apartheid Act's co-author, who forcefully asserted that the statute was to have no preemptive effect. 132 Cong.Rec. § 12533 (daily ed., Sept. 15, 1986).

**48.** Anticipating a presidential veto, the House leadership had put the Anti–Apartheid Act on an expedited schedule. The bill did not go to conference committee, and Members were not permitted to offer amendments. Thus, the House simply voted on the text of the bill as passed by the Senate. Under these unusual circumstances, the Act's House sponsors drafted the Resolution in order to express their views on the preemption issue. We recognize that the Resolution merely expresses the sense of the House and thus lacks the force and effect of law. We rely on this Resolution, however, insofar as it illustrates the House's understanding that the Act did not preempt state and local divestiture legislation.

of Reps. Gray, Leland, Solarz, Weiss, Levine, Rangel, Biaggi, Dixon, and Wheat).

In light of the foregoing legislative history, we cannot conclude that it was the intent of the Congress to preempt state or local legislation such as the Ordinances.

■ Finally, we consider whether the Ordinances may be preempted because they actually conflict with federal law. As mentioned previously, a conflict occurs when compliance with both the federal law and state law is impossible or where the state law impedes accomplishment of the purposes of the federal law. Courts will not hold that a state law is preempted by conflict where the conflict with federal law is merely potential or speculative. *See, e.g., Exxon Corp. v. Governor of Md., supra,* 437 U.S. at 130–131, 98 S.Ct. at 2216; *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446, 80 S.Ct. 813, 817–818, 4 L.Ed.2d 852 (1960).

■ In the present case, the Trustees argue that the Ordinances are preempted because they impose inflexible "sanctions" that conflict with the Act's "carrot and stick" approach to South Africa. We disagree. Unlike the federal statute, the Ordinances are not aimed directly at the conduct of the South African government but rather at the conduct of businesses in which the City has investments. The Ordinances do not attempt to impose sanctions on South Africa. Moreover, nothing in the Anti–Apartheid Act suggests that Congress believed that divestment efforts would interfere with its system of sanctions and incentives.

The Trustees also point out that the federal statute does not require American companies to relinquish their South African holdings; rather, the Act provides only that companies doing business in South Africa must adhere to the Sullivan Principles. *See* §§ 5034–5035. Therefore, the Trustees argue, the Anti–Apartheid Act conflicts with the Ordinances which require the City to divest even from companies complying with the Sullivan Principles. We find no conflict in this regard. The Anti–Apartheid Act does not require that American companies both remain in South

Africa and adhere to the Sullivan Principles; it merely prescribes a code of fair employment practices for companies that choose to remain in that country. Consequently, the Anti–Apartheid Act does not contemplate that change can occur in South Africa only if American businesses are affirmatively encouraged to remain there. In fact, some provisions of the Act, such as the prohibition on new investment, may actually discourage businesses from remaining.[49] Therefore, even assuming that the Ordinances may also discourage businesses from remaining in South Africa, they cannot be said to frustrate the narrow congressional objectives underlying the federal Act. *Cf. Nash v. Florida Industrial Comm'n,* 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967).

## VI.

The Trustees and the Intervenors maintain that the Ordinances impermissibly intrude upon the federal government's general authority to determine and carry out the foreign policy of the United States.

 The federal government possesses paramount authority to conduct the nation's foreign affairs. *See, e.g., United States v. Pink,* 315 U.S. 203, 233, 62 S.Ct. 552, 567, 86 L.Ed. 796 (1942); *Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 402, 85 L.Ed. 581 (1941). As a consequence, state laws relating to foreign affairs may be unconstitutional, even if they are not preempted by a federal treaty or statute, if the "State's policy may disturb foreign relations." *Zschernig v. Miller,* 389 U.S. 429, 441, 88 S.Ct. 664,

---

**49.** Similarly, § 10231(a) of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203 (1987), amended I.R.C. § 901 (1982) to deny a credit for taxes paid to the South African government. This provision took effect on January 1, 1988, and will remain in force until the Secretary of State certifies that South Africa has met certain requirements set forth in the Anti–Apartheid Act. *See also* 12 U.S.C. § 635(b)(9), which prohibits the Export–Import Bank of the United States from extending credit "in support of any export which would contribute to enabling the Government of South Africa to maintain or enforce apartheid.

671, 19 L.Ed.2d 683 (1968).[50] Yet, many state laws are entirely valid even though they "involv[e] matters of significant concern to foreign relations," Restatement (Second) Foreign Relations Law of the United States, § 2 comment d (1965). *See, e.g., Clark v. Allen*, 331 U.S. 503, 516–517, 67 S.Ct. 1431, 1438–1439, 91 L.Ed. 1633 (1947); *Springfield Rare Coin Galleries, Inc. v. Johnson*, 115 Ill.2d 221, 233, 104 Ill.Dec. 743, 749, 503 N.E.2d 300, 306 (1986); *K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n*, 75 N.J. 272, 293, 381 A.2d 774, 784 (1977), *appeal dismissed*, 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). *See also De Canas v. Bica*, 424 U.S. 351, 355, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976); *Zschernig v. Miller, supra*, 389 U.S. at 461, 88 S.Ct. at 681 (Harlan, J., concurring); L. Tribe, *American Constitutional Law*, § 4–6, at 230 (2d ed. 1988).[51]

In determining the boundary between permissible and impermissible state legislation, two decisions of the Su-

---

**50.** The question of whether state legislation intrudes upon the dormant foreign relations power is closely related to the question of whether such laws violate the negative implications of Congress's power to regulate foreign commerce. *See Container Corp. v. Franchise Tax Board*, 463 U.S. 159, 194, 103 S.Ct. 2933, 2955, 77 L.Ed.2d 545 (1983) (state tax may place impermissible burden on foreign commerce if it "implicate[s] foreign policy issues which must be left to the Federal Government"). As one author has observed (Note, *State and Local Anti–South Africa Action as an Intrusion upon The Federal Power in Foreign Affairs*, 72 Va.L.Rev. 813, 832 (1986)): "Conceptually, and in terms of the evils they address, these two doctrines are distinguishable only in that the commerce clause attack logically seems no more than a slice of the foreign-relations pie. The basic idea behind both, in the context of foreign commerce, is that no subdivision of the Union should be able to act independently so as to affect adversely the whole."

**51.** The Trustees rely on *Bethlehem Steel Corp. v. Board Commissioners*, 276 Cal.App.2d 221, 80 Cal.Rptr. 800 (1969), in which an intermediate appellate court held California's "Buy American Act" unconstitutional. As the Supreme Court of New Jersey pointed out, however, the *Bethlehem Steel* case appears to take the incorrect position that "any state statute which in any way touches upon foreign affairs is proscribed," *K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n, supra*, 75 N.J. at 293, 381 A.2d at 784.

preme Court are particularly significant. The are *Clark v. Allen, supra,* 331 U.S. 503, 67 S.Ct. 1431, and *Zschernig v. Miller, supra,* 389 U.S. 429, 88 S.Ct. 664.

In *Clark v. Allen,* the Supreme Court considered a California statute under which a nonresident alien could inherit personal property only if, under the laws of the alien's nation, American citizens had a "reciprocal right" to inherit personal property on the same terms and conditions as the alien's fellow citizens. German legatees, attempting to sustain a testamentary gift from a California resident, argued that the statute was unconstitutional on the ground that California had sought to "promote the right of American citizens to inherit abroad by offering to aliens reciprocal rights of inheritance in California," 331 U.S. at 516–517, 67 S.Ct. at 1439. The legatees argued that this "offer of reciprocal arrangements" was "a matter for settlement by the Federal Government on a nation-wide basis," 331 U.S. at 517, 67 S.Ct. at 1439. The Supreme Court rejected that argument as "far fetched." *Ibid.* Writing for the Court, Justice Douglas observed that rights of succession to property are governed by local law and that no federal treaty preempted the California statute under the circumstances of that case. The Court continued (*ibid.*): "Nor has California entered the forbidden domain of negotiating with a foreign country ... or making a compact with it contrary to the prohibition of Article I, Section 10 of the Constitution." Thus, the Court upheld the statute, stating (*ibid.*): "What California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line."

Twenty-one years later, however, the Supreme Court struck down a similar Oregon law on the ground that the statute's "history and operation" established that it was "an intrusion by the State into the field of foreign affairs," *Zschernig v. Miller, supra,* 389 U.S. at 432, 88 S.Ct. at

666.[52] Again, writing for the Court, Justice Douglas distinguished his opinion in *Clark v. Allen, supra,* reasoning that the prior decision was "concerned with the words of a statute on its face, not the manner of its application," 389 U.S. at 433, 88 S.Ct. at 667. The Court continued (389 U.S. at 433–434, 88 S.Ct. at 667):

> "State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, albeit there is a remote possibility that any holding may disturb a foreign nation—whether the matter involves commercial cases, tort cases, or some other type of controversy. At the time *Clark v. Allen* was decided, the case seemed to involve no more than a routine reading of foreign laws. It now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called 'rights' are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation."

The Supreme Court found in *Zschernig* that the application of the Oregon statute had "led into minute inquiries

---

**52.** The Oregon statute provided that property claimed by nonresident aliens would escheat unless they could show (389 U.S. at 430–431, 88 S.Ct. at 665):

> "(1) the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the foreign county;
>
> (2) the right of United States citizens to receive payment here of funds from estates in the foreign county; and
>
> (3) the right of the foreign heirs to receive the proceeds of Oregon estates 'without confiscation.'"

concerning the actual administration of foreign law," 389 U.S. at 435, 88 S.Ct. at 668. In the course of such inquiries, Oregon courts, along with the courts of other states applying similar statutes, had engaged in extensive critical commentary concerning the nature and conduct of foreign governments. 389 U.S. at 436–439 & nn. 8, 9, 88 S.Ct. at 668–670 & nn. 8, 9.[53] The Court stated that "as construed," the Oregon statute "seem[ed] to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own," 389 U.S. at 440, 88 S.Ct. at 670. The Court held that, because of "its great potential for disruption or embarrassment," the Oregon law had "more than 'some incidental or indirect effect in foreign countries,'" 389 U.S. at 434–435, 88 S.Ct. at 667. In the Court's view, the Oregon statute, as enforced, "affect[ed] international relations in a persistent and subtle way," 389 U.S. at 440, 88 S.Ct. at 670. In reaching this conclusion, the Court recognized, as in *Clark v. Allen, supra,* that the states "have traditionally regulated the descent and distribution of estates," 389 U.S. at 440, 88 S.Ct. at 671. "But," Justice Douglas emphasized, "those regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Ibid.*

In explaining the distinction between *Clark v. Allen* and *Zschernig v. Miller,* courts and commentators have focused on the extensive judicial scrutiny and criticism of foreign governments to which the Court referred in the *Zschernig* opinion. *K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n, supra,* 75 N.J. at 291–292, 381 A.2d at 784; *Matter of Leikind,* 22 N.Y.2d 346, 352, 292 N.Y.S.2d 681, 685, 239 N.E.2d 550, 553 (1968), *appeal dismissed,* 397 U.S. 148, 90 S.Ct. 990, 25 L.Ed.2d 182 (1970); *Gorun v. Fall,* 287 F.Supp. 725, 728 (D.Mont.1968), *aff'd,* 393 U.S. 398, 89 S.Ct. 678, 21 L.Ed.2d 628 (1969); Lewis,

---

**53.** In at least one instance, the application of the Oregon statute had prompted a complaint from a foreign nation. 389 U.S. at 437 n. 7, 88 S.Ct. at 668–669 n. 7.

*Dealing with South Africa: The Constitutionality of State and Local Divestment Legislation,* 61 Tul.L.Rev. 469, 513 (1987); Troyer, Slocombe & Boisture, *Divestment of South Africa Investments: The Legal Implications for Foundations, Other Charitable Institutions, and Pension Funds, supra,* 74 Geo.L.J. at 159. As one group of commentators has observed (Troyer, Slocombe & Boisture, *supra,* 74 Geo.L.J. at 159):

> "The fatal flaw in administration of the Oregon nonresident inheritance statute was not that state law touched on foreign affairs, but the detailed, case-by-case judicial inquiries into foreign practices that the law entailed. Therefore, a single, general decision by a state mandating the divestment of state funds arguably would be beyond the scope of *Zschernig.*"

*Zschernig v. Miller* circumscribes, but apparently does not eliminate, a state's ability under certain circumstances to take actions involving substantive judgments about foreign nations.

In the present case, the circuit court concluded that the Baltimore City Ordinances did not unconstitutionally intrude upon the federal government's authority over foreign affairs. The court reasoned that divestiture "requires no continuing investigation, assessment or commentary by local government officials or employees into the laws or operations of the South African government." We agree. The Ordinances merely represent "a single, general decision" by Baltimore, "mandating the divestment" of the City's pension funds; as such, they are "beyond the scope of *Zschernig,*" Troyer, Slocombe & Boisture, *supra,* 74 Geo.L.J. at 159. *See* 69 Op. of Att'y Gen. of Md. 87, 90 (1984) (expressing the view that Code (1985), § 6–208 of the State Finance and Procurement Article, generally prohibiting the deposit of State funds in financial institutions with loans to the South African government, "does not call for the level of state intrusion found repugnant in *Zschernig* ").

 Baltimore City's purpose in enacting the Ordinances was simply to ensure that the City's pension funds would not be invested in a manner that was morally offensive to many Baltimore residents and many beneficiaries of the pension funds. In addition, as the circuit court held, the effect of the Ordinances on South Africa is minimal and indirect. A state or local law is not invalid if it has only "some incidental or indirect effect in foreign countries," *Clark v. Allen, supra,* 331 U.S. at 517, 67 S.Ct. at 1439; *Zschernig v. Miller, supra,* 389 U.S. at 434, 88 S.Ct. at 667. And, as one author observed (Note, *State and Municipal Governments React Against South African Apartheid: An Assessment of the Constitutionality of the Divestment Campaign,* 54 U.Cinn.L.Rev. 543, 574 (1985)): "When a state sells its stock in a corporation doing business in South Africa, it has no immediate effect on foreign relations between South Africa and the United States."

 Moreover, in the case at bar, the impact in South Africa is even further diminished because the Ordinances apply only to investments in companies doing a significant amount of business in South Africa and because the City Council included elaborate provisions ensuring that divestiture would only occur at a gradual pace. Finally, the circuit court found "that divestment alone would not cause companies to leave South Africa and that the divestment movement does not create political instability in that country." In sum, the Ordinances' impact in South Africa is clearly minimal.

The Trustees and the Intervenors rely heavily on three cases from other jurisdictions.

In *Springfield Rare Coin Galleries, Inc. v. Johnson, supra,* 115 Ill.2d 221, 503 N.E.2d 300, the Illinois legislature had created an exemption from state occupation and use taxes for coins and currency issued by the United States and any foreign country except South Africa. The Supreme Court of Illinois held that, because the exclusion of South African coins was not "motivated by a legitimate, permissi-

ble State purpose," 115 Ill.2d at 232, 503 N.E.2d at 305, the statute violated the Illinois Constitution. *See* 115 Ill.2d at 232, 237, 503 N.E.2d at 305, 307. In reaching this decision, the court reasoned that "the exclusion's sole motivation [was] disapproval of a nation's policies" and that this "create[d] a risk of conflict between nations, and possible retaliatory measures," 115 Ill.2d at 236, 503 N.E.2d at 307. The court further observed that "the exclusion [was] targeted at a single foreign nation." *Ibid.* Finally, the court noted that "the practical effect of the exclusion [was] to impose, or at least encourage, an economic boycott of the South African Krugerrand" and that "regulations which amount to embargoes or boycotts are outside the realm of permissible State activity," 115 Ill.2d at 236–237, 503 N.E.2d at 307.

*New York Times Co. v. City of New York Comm'n on Human Rights,* 41 N.Y.2d 345, 346, 393 N.Y.S.2d 312, 313, 361 N.E.2d 963 (1977), involved publication by the *New York Times,* allegedly in violation of New York City's antidiscrimination laws, of advertisements of employment opportunities in South Africa, which merely referred to that country as the situs of employment and did not recite any discriminatory conditions. A plurality of the Court of Appeals of New York stated that the City's Commission on Human Rights could not apply the antidiscrimination law to the newspaper's conduct in that case, since the agency "was without jurisdiction to make and enforce its own foreign policy," 41 N.Y.2d at 352, 393 N.Y.S.2d at 317. The plurality reasoned (41 N.Y.2d at 353, 393 N.Y.S.2d at 318):

> "It was beyond the ken of the city Commission on Human Rights to enforce local antidiscrimination laws by imposing an economic boycott of the Republic of South Africa. In this very case, the commission conducted an inquiry that might have been considered offensive by the Republic of South Africa and which might have been an embarrassment to those charged with the conduct of our Nation's foreign policy. The true danger is that if New York City could do this in one instance, it could do so in many instances. Each locality in each State may not

adopt its own foreign policy. This would be disastrous, not only because of multiplicity and divergence of policies, but because local decisions are often influenced by pragmatic local considerations which are not necessarily controlling or even relevant to national policy as determined by the Federal Government at Washington."

Finally, in *Tayyari v. New Mexico State University*, 495 F.Supp. 1365 (D.N.M.1980), the University's regents had moved to deny admission or readmission to any Iranian students until Iran released the Americans whom it held as hostages. The court observed that the State Department had cautioned against actions such as those of the regents (*id.* at 1378, quoting affidavit of David D. Newsom, Undersecretary for Political Affairs, U.S. Department of State).[54] In considering whether the University's conduct would "potentially affect" international relations, the court said (*id.* at 1379–1380):

"Here, Regents' motion is directed at one nation, Iran. Their purpose was to make a political statement about the hostage situation in Iran and to retaliate against Iranian nationals here. The potential effect on international relations *vis-a-vis* Iran is much greater here than with a regulation affecting all aliens regardless of nationality. Attempts to solve the hostage crisis must come from the federal government. State officials in New Mexico must not impede those efforts."

---

**54.** Mr. Newsom had stated as follows:

"State action directed essentially against Iranians, in response to the hostage crisis, although motivated by a high sense of patriotism and intended to complement federal actions, would potentially impede the conduct of our foreign relations. Such action would constitute a serious unsanctioned state involvement in the conduct of United States foreign policy and international relations. . . . [A] failure to provide Iranian nationals lawfully in this country with fair and nondiscriminatory treatment and the assurance of the equal protection of United States laws could have a negative impact on prospects for securing the early and safe release of the hostages. State actions of this nature will necessarily impair the Federal Government's ability to manage this crisis."

Each of these decisions is distinguishable from the present case. Both *New York Times Co. v. City of New York Comm'n on Human Rights, supra,* and *Springfield Rare Coin Galleries, Inc. v. Johnson, supra,* involved state or local government efforts to structure relationships between its residents on one hand and South Africa or South African nationals on the other. In *New York Times Co.,* New York City attempted to prevent newspapers from accepting employment notices from South African employers. Similarly, in *Springfield Rare Coin Galleries,* Illinois sought to deter coin dealers in that State from contracting to import South African currency. The Baltimore City Ordinances, however, are primarily an attempt by the City to structure its own financial affairs. In calling for divestiture of the City's pension funds, Baltimore did not curtail the rights of South Africa or its citizens or any foreign national. Thus, although the Ordinances might be viewed as having some tangential effect on economic relations between American firms and South African businesses or government, their impact on foreign affairs is far smaller than New York City's action in *New York Times Co., supra,* or that of Illinois in *Springfield Rare Coin Galleries, supra.*

In *Tayyari v. New Mexico State University, supra,* the state action was directly aimed at certain foreign nationals, preventing them from attending a public university. As pointed out above, however, the Baltimore City Ordinances do not curtail the activity of South African nationals or directly affect them. Instead, the Ordinances are aimed at the City's Trustees, telling the Trustees how best to invest City pension funds. In addition, the State Department in *Tayyari* had taken the position that actions like those of the University might impede efforts to win the hostages' release; thus, in that case, there was a strong federal interest in avoiding interference from state measures that went beyond the sanctions already imposed by the national government. Troyer, Slocombe & Boisture, *supra,* 74 Geo.

L.J. at 159 n. 125. In the case of divestiture, however, the federal government has not taken the same position.

The question of investment policy for public pension funds is ordinarily governed by local law, and no federal treaty or statute preempts the enactments at issue in this case. Furthermore, in enacting these Ordinances, Baltimore City did not enter "the forbidden domain of negotiating with a foreign country ... or making a compact with it" in violation of Article I, § 10, of the United States Constitution. *Clark v. Allen, supra,* 331 U.S. at 517, 67 S.Ct. at 1439. Finally, as shown above, the Ordinances have only an incidental or indirect affect in foreign countries. Consequently, we hold that the Ordinances do not intrude upon the federal government's authority to conduct foreign relations.

## VII.

The Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, empowers the Congress "to regulate Commerce with foreign Nations, and among the several States...." The Clause is both an affirmative grant of legislative power to Congress and an implied limitation on the power of state and local governments to enact laws affecting foreign or interstate commerce. *See New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *County Comm'rs of Charles Co. v. Stevens,* 299 Md. 203, 208, 473 A.2d 12, 14 (1984). The aspect of the Commerce Clause which operates as an implied limitation upon state and local government authority is often referred to as the "dormant" or "negative" Commerce Clause.

The Trustees and Intervenors argue that, in violation of this "dormant" aspect of the Commerce Clause, the Baltimore City Ordinances place an impermissible burden on interstate commerce and improperly regulate foreign commerce. The City responds by contending that, in passing

the Ordinances, the City is not subject to the scrutiny of the dormant Commerce Clause because the City is functioning as a "market participant." The Trustees and Intervenors reply that the City is not acting as a market participant and that, in any case, the market participant doctrine is inapplicable to foreign commerce.

## A.

In adopting the "market-participant doctrine," the Supreme Court has held that, when a state acts as a buyer or seller in a market rather than in its "distinctive governmental capacity," its behavior is not "subject to the limitations of the negative Commerce Clause." *New Energy Co. of Indiana v. Limbach, supra,* 108 S.Ct. at 1809. In other words, "if a State is acting as a market participant, rather than as a market regulator, the dormant commerce clause places no limitation on its activities." *South–Central Timber Devo., Inc. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984). *See Wisconsin Dept. of Industry v. Gould,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986); *United Bldg. & Constr. Trades Council v. Mayor of Camden,* 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984); *White v. Mass. Council of Constr. Employers,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976); *County Comm'rs of Charles Co. v. Stevens, supra,* 299 Md. 203, 473 A.2d 12; L. Tribe, *American Constitutional Law, supra,* § 6–11.

As the Supreme Court explained in *Reeves, Inc. v. Stake, supra,* 447 U.S. at 436–437, 100 S.Ct. at 2277, "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace.... There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." Accordingly, the Supreme Court has held that the Commerce Clause was not implicated when South Dakota adopted a policy under which sales

from a state-owned cement plant were confined to state residents, *Reeves, Inc. v. Stake, supra.* Similarly, this Court has held that the market-participant doctrine shielded a local regulation providing that no trash from outside Charles County's territorial limits could be disposed at the County's publicly owned landfill. *County Comm'rs of Charles Co. v. Stevens, supra.*

The Trustees and Intervenors argue that, even when a State buys, sells, or invests in articles of commerce, the State is a market regulator rather than a market participant unless it has acted in order to " 'favor its own citizens over others,' " (*quoting Hughes v. Alexandria Scrap Corp., supra,* 426 U.S. at 810, 96 S.Ct. at 2498). The Divestiture Ordinances do not purport to favor Baltimore City residents over others. Therefore, the Trustees and Intervenors conclude, the market-participant doctrine is inapplicable.

In the cases in which the Supreme Court and this Court have recognized claims of market participation, the State has largely acted in its own citizens' economic interest and to the disadvantage of citizens of other states. *See, e.g., United Bldg. & Constr. Trades Council v. Mayor of Camden, supra,* 465 U.S. 208, 104 S.Ct. 1020; *White v. Mass. Council of Constr. Employers, supra,* 460 U.S. 204, 103 S.Ct. 1042; *Reeves, Inc. v. Stake, supra,* 447 U.S. 429, 100 S.Ct. 2271; *Hughes v. Alexandria Scrap Corp., supra,* 426 U.S. 794, 96 S.Ct. 2488; *County Comm'rs of Charles Co. v. Stevens, supra,* 299 Md. 203, 473 A.2d 12.

The Supreme Court has not, however, limited the market-participant principle to legislation aimed at economically benefitting a state's own citizens. Courts have applied the market-participant doctrine even when a State's conduct was not clearly designed to benefit local economic interests at the expense of nonresidents. *See, e.g., Salem Transp. Co. v. Port Authority of N.Y. & N.J.,* 611 F.Supp. 254 (S.D.N.Y.1985); *Transport Limo. v. Port Authority of N.Y. & N.J.,* 571 F.Supp. 576 (E.D.N.Y.1983). Similarly, in

*K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n, supra,* 75 N.J. 272, 381 A.2d 774, the court applied the market-participant doctrine to uphold New Jersey's "Buy American" statute. At best, that law benefitted state residents only indirectly by channelling state funds away from foreign manufacturers and towards American manufacturers, some of whom might have been located in New Jersey.

Language in the Supreme Court's opinions clearly suggests that the market-participant doctrine has a broader sweep than argued for by the Trustees and Intervenors. For example, in *Reeves, Inc. v. Stake, supra,* the Court indicated that the doctrine rests in part on " 'the long recognized right of a trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal,' " 447 U.S. at 438–439, 100 S.Ct. at 2278 (*quoting United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). "Moreover," the Court continued, "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." 447 U.S. at 438–439, 100 S.Ct. at 2278–2279. These broad statements suggest that, just as a private merchant may elect not to deal with companies doing business in South Africa, the City too may make the same choice unhindered by the constraints of the Commerce Clause.

Furthermore, because the Divestiture Ordinances do not favor local residents at the expense of nonresidents, they pose a smaller threat to the national common market than do the overtly discriminatory measures that, according to the Trustees, the market-participant doctrine sanctions. With regard to state regulatory legislation, the Supreme Court has long recognized that, while discrimination in favor of local economic interests is usually invalid under the

Commerce Clause, nondiscriminatory legislation will be upheld unless the burden on interstate commerce outweighs the local interests effectuated by the legislation. *Compare Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), *with Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Thus, as to the applicability of the market-participant doctrine, " 'It would be odd indeed to find that when a state becomes less parochial ... its purpose becomes suspect under the Commerce Clause,' " *Reeves, Inc. v. Stake, supra,* 447 U.S. at 445, 100 S.Ct. at 2281 (*quoting K.S.B. Tech. Sales Corp. v. New Jersey Dist. Water Supply Comm'n, supra,* 75 N.J. at 298, 381 A.2d at 787).

The Trustees and Intervenors rely heavily on the Supreme Court's opinion in *Wisconsin Dept. of Industry v. Gould, supra,* 475 U.S. 282, 106 S.Ct. 1057. In that case, a statute prohibited the state, for a period of three years, from purchasing products manufactured or sold by entities who had been found to have violated the National Labor Relations Act in three separate cases over a five-year period. Because Wisconsin had provided a "supplemental sanction" that conflicted with Congress's comprehensive plan for labor regulation, the Court held that the National Labor Relations Act preempted the state law. Wisconsin, however, had defended its statute by invoking the market-participant doctrine. While observing that this doctrine applies only where Congress has failed to act and not where Congress has affirmatively legislated, the Court also stated (475 U.S. at 289, 106 S.Ct. at 1062): "We agree with the Court of Appeals, however, that by flatly prohibiting state purchases from repeat labor law violators Wisconsin 'simply is not functioning as a private purchaser of services, ...'; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation." Similarly, the Trustees maintain that, by "flatly prohibiting" investments in companies doing business in South Africa, the City has engaged in market regulation as opposed to market participation.

We believe that the Trustees' reliance on the Court's brief remarks in *Gould* is misplaced. Preliminarily, we note that the decision in *Gould* was based on preemption, and the Court clearly held that the market-participant doctrine is inapplicable where state or local action is preempted. Furthermore, the circumstances in *Gould* are clearly distinguishable from those in the present case. The legislation at issue in *Gould* was conceded by the state to be punitive. Repeat labor law violators could not conduct any business with the State for three years. Thus the corporate appellee in *Gould* could not contract with the State because of "four [National Labor Relations] Board orders against various divisions of the company, ... none of which [appellee] still owned at the time of its debarment." *Gould, supra,* 475 U.S. at 285, 106 S.Ct. at 1060. The Baltimore City Ordinances, on the other hand, have the primary purpose of removing a perceived moral taint from the City's investments and not to punish any entity. Furthermore, under the Ordinances, a company suffers no protracted "sanction" of the type employed in *Gould.* A company which ceases to do substantial business with South Africa may immediately "benefit" from the City's investment.

The Trustees' interpretation of *Gould* would conflict with the Supreme Court's recognition that, when a state acts in a proprietary capacity, the Commerce Clause is not concerned with its decisions as to the parties with whom it will or will not deal. *See, e.g., Reeves, Inc. v. Stake, supra,* 447 U.S. at 438–439, 100 S.Ct. at 2278.

The Trustees and Intervenors also rely upon *South–Central Timber Devo., Inc. v. Wunnicke, supra,* involving an Alaska regulation under which a purchaser of state-owned timber was required, as a condition of his contract, to process the timber in Alaska before shipping it outside of that State. In *South–Central Timber,* Justice White, writing for the plurality, stated (467 U.S. at 97–98, 104 S.Ct. at 2245):

"The limit of the market participant doctrine must be that it allows a State to impose burdens on commerce

within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market."

In the plurality's view, Alaska was a market participant in the market for the sale of timber but not in the market for processed timber. Thus, because the State had exerted its economic leverage to affect a market in which it did not participate, it acted as a market regulator.

On the other hand, in *White v. Mass. Council of Constr. Employers, supra,* the Court held that the market-participant doctrine applied when the Mayor of Boston ordered that, on construction projects funded in whole or in part with City funds, at least 50% of the work force should be composed of Boston residents. Thus, the *White* Court permitted the City of Boston to use its economic leverage over public contractors in order to limit the contractors' discretion as to the parties with whom they might deal. In reaching this decision, the Court reasoned that the City's action "cover[ed] a discrete, identifiable class of economic activity in which the city [was] a major participant." 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. Moreover, the Court continued, "[e]veryone affected by the order [was], in a substantial if informal sense, 'working for the city.'" *Ibid.* In *South–Central Timber, supra,* the Court distinguished *White* as follows (467 U.S. at 99, 104 S.Ct. at 2246):

"In contrast to the situation in *White,* this restriction on private economic activity takes place after the completion of the parties' direct commercial obligations, rather than during the course of an ongoing commercial relationship in which the city retained a continuing proprietary interest in the subject of the contract."

We think that the present case is more like the situation in *White* than that in *South–Central Timber.* The City's ownership of a security gives rise to "an ongoing commercial relationship in which the city retain[s] a continuing proprietary interest" in the firm in which it invests. Thus,

the City is not imposing conditions which have a substantial regulatory effect outside of the market in which it is participating.

## B.

The Supreme Court has expressed no opinion as to whether the market-participant doctrine applies to state conduct affecting foreign commerce. *Reeves, Inc. v. Stake, supra,* 447 U.S. at 438 n. 9, 100 S.Ct. at 2278 n. 9. *See also South–Central Timber Devo., Inc. v. Wunnicke, supra,* 467 U.S. at 96, 104 S.Ct. at 2245. The considerations underlying the restraints on state power to burden foreign commerce are distinct from the considerations underlying the restraints on state authority to burden interstate commerce. Also, a "more extensive constitutional inquiry is required" when applying the foreign Commerce Clause. *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 446, 99 S.Ct. 1813, 1820, 60 L.Ed.2d 336 (1979).

As noted previously, however, the concerns which underlie the foreign Commerce Clause are closely related to the concerns underlying the limits on a state's authority to affect foreign policy. The purpose behind both limitations is to prevent individual states from adversely affecting relations with foreign countries that are properly coordinated on a national level. In the circumstances of this case, application of the market-participant doctrine to state conduct affecting foreign commerce does no violence to this goal. As discussed in Part VI of this opinion, the Ordinances are not inconsistent with national policy. There is no clear evidence that the federal government views local divestiture efforts as conflicting with national foreign policy.

Some authorities have taken the position that the market-participant doctrine would be applicable in foreign commerce cases. For example, in *K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Comm'n, supra,* 75 N.J. 272, 381 A.2d 774, the Supreme Court of New Jersey used the market-participant doctrine to uphold New Jersey's "Buy–

American" Statute, which generally required the use of American products in projects funded by the state. The New Jersey court recognized that "some differences between interstate and foreign commerce exist," but saw no need "to differentiate between the two" in the factual context of that case. 75 N.J. at 300, 381 A.2d at 788.

In *Carll v. S.C. Jobs–Economic Devel. Authority*, 284 S.C. 438, 327 S.E.2d 331 (1985), the Supreme Court of South Carolina upheld a statute which provided capital and management assistance to certain South Carolina enterprises against a challenge that the legislation interfered with interstate and foreign commerce. The Court held: "The Commerce Clause does not prohibit implementation of any portion of this Act because South Carolina is a market participant and is entitled to establish guidelines for its participation regardless of the effect on interstate or foreign commerce." 327 S.E.2d at 337.

Similarly, the Attorney General of Maryland, in a letter to the Governor, expressed the opinion that the market-participant exception applied to Code (1985), § 6–208 of the State Finance and Procurement Article, which generally prohibits the State from depositing its funds in financial institutions with loans in South Africa. 69 Op. of the Att'y Gen. of Md., *supra*, at 88–89. In reaching this conclusion, the Attorney General emphasized that the statute embodied the State's decision concerning "where to deposit its own funds." *Ibid.*

Finally, we note that a leading contemporary treatise on constitutional law specifically states that, despite their effect on foreign commerce, divestiture statutes and ordinances fall within the market-participant doctrine:

"A distinction must be drawn between state regulation of foreign commerce, and state participation in foreign commerce. The former activity is tightly proscribed by the negative implications of what might be called the foreign commerce clause. Thus, a state or local government that opposed the regime of apartheid in the Union of South Africa could not, absent congressional authorization, enact a measure denying South African companies

the privilege of doing business within its jurisdiction; nor could a state or locality forbid its citizens and resident corporations from investing in or trading with multinational corporations which have affiliates or subsidiaries in South Africa. But under the Supreme Court's market participant exception to the commerce clause, a state would be free to pass laws forbidding investment of the state's pension funds in companies that do business with South Africa, or rules requiring that purchases of goods and services by and for the state government be made only from companies that have divested themselves of South African commercial involvement."

L. Tribe, *American Constitutional Law, supra,* § 6–21, at 469.

While a few authors have reached a contrary conclusion,[55] we are persuaded that, in mandating the divestment of municipally administered pension funds, the City of Baltimore acted as a market participant even though its actions had consequences for foreign commerce. Unlike the examples of market regulation set forth in Professor Tribe's treatise, the Ordinances do not attempt to interfere with private, commercial transactions between persons engaged in foreign commerce. Rather, the Ordinances simply represent Baltimore City's decision concerning the proper way of investing funds which the City has the authority to administer and which therefore "belong" to the City, although as a trustee. *See* 69 Op. of the Att'y Gen. of Md., *supra,* at 88–89. Moreover, in light of the particular circumstances of this case, we see no reason why a different result should obtain simply because the Ordinances may affect both interstate and foreign commerce. *See K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Comm'n, supra,* 75 N.J. at 300, 381 A.2d at 788; *Carll v. S.C. Jobs—Economic Devel. Authority, supra,* 327 S.E.2d at 337. Consequently, we

---

**55.** Lewis, *Dealing With South Africa: The Constitutionality of State and Local Divestment Legislation,* 61 Tul.L.Rev. 469, 478–487 (1987); Note, *State and Local Anti–South Africa Action as an Intrusion upon The Federal Power in Foreign Affairs, supra,* 72 Va.L.Rev. at 838–841.

hold that, under the market-participant doctrine, the Ordinances do not violate the negative implications of Congress' power to regulate foreign commerce.

## C.

 Even if the Ordinances were not exempt from Commerce Clause scrutiny because of the market-participant doctrine, we believe that they would survive such scrutiny.

### (1)

In *Pike v. Bruce Church, Inc., supra,* the Supreme Court set forth the test for determining the constitutionality of state or local laws affecting interstate commerce (397 U.S. at 142, 90 S.Ct. at 847):

> "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

In *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), the Supreme Court clarified when the *Pike v. Bruce Church* test is applicable, noting that when evaluating the constitutionality of state laws affecting interstate commerce, the appropriate standard to be applied depends on whether the statute's effect on interstate commerce is incidental or whether the statute affirmatively discriminates against interstate commerce. The Court stated (477 U.S. at 138, 106 S.Ct. at 2447):

> "In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden inter-

state transactions only incidentally, and those that affirmatively discriminate against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits,' *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979), that once a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."

*See, e.g., Sporhase v. Nebraska Ex Rel. Douglas*, 458 U.S. 941, 955–956, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982); *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Exxon Corp. v. Governor of Maryland, supra*, 437 U.S. at 126, 98 S.Ct. at 2214; *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).

There has been no showing that the Ordinances, either facially or in purpose and effect, favor residents of the City of Baltimore or the State of Maryland over residents of any other State. They apply even-handedly. The divestiture provisions are applicable to all firms in which the City might wish to invest, wherever those firms might be located. In enacting the Ordinances, the City Council clearly did not intend to secure economic advantages for local businesses at the expense of businesses situated elsewhere. *Compare, e.g., Dean Milk Co. v. City of Madison, Wis., supra*, 340

U.S. 349, 71 S.Ct. 295.[56]

Therefore, under *Pike v. Bruce Church, supra,* we must inquire whether the incidental burden on interstate commerce caused by divestment is "clearly excessive" in relation to the City's legitimate local interests.

In our opinion, it is indisputable that the Ordinances effectuate legitimate, local public interests. The divestiture provisions respond to the local interest in managing the City's finances and in ensuring that pension funds are invested in a socially responsible manner. They permit the City and its citizens to distance themselves from the moral taint of coventuring in firms that, in the view of many, help to maintain South Africa's system of racial discrimination. Finally, they express the City's sensitivity to the deep feeling of its citizenry on this matter of fundamental human dignity.

The Trustees and Intervenors argue that by requiring the sale of hundreds of millions of dollars of investment portfolios, with the intended effect of forcing corporations to withdraw from business operations in and with South Africa, the Ordinances substantially burden interstate commerce. While we do not dispute that the Ordinances impose some burden on interstate commerce, in our opinion that burden is not excessive in relation to the benefits. The Ordinances embody the City's moral condemnation of racial discrimination. The use of pension funds arguably to sup-

---

**56.** The Intervenors, citing *Milk Control Bd. v. Eisenberg Farm Prods.,* 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939), suggest that the Ordinances are discriminatory because they "block or impair the commerce of certain companies based upon the location of their operations." (Brief at p. 24). The Intervenors, however, fail to recognize that, under the principle they invoke, the location of operations is relevant only to the extent that a State discriminates against out-of-state businesses and in favor of in-state businesses. *See generally,* Tribe, *American Constitutional Law, supra,* §§ 6–6 to 6–9, 6–17. To show "discrimination" against companies doing business in South Africa is not necessarily the same as showing discrimination in favor of local interests. Lewis, *Dealing With South Africa: The Constitutionality of State and Local Divestment Legislation, supra,* 61 Tul.L. Rev. at 493–494.

port racial discrimination in South Africa is an issue of deep concern, not only to the pension systems' members and beneficiaries but also to all citizens of Baltimore who are sensitive to slavery's persistent legacy. In our judgment, the Ordinances' burden on the interstate sale of securities does not outweigh these unique and profound local concerns.

Urging a contrary conclusion, the Trustees argue (Brief at p. 50) that the Ordinances "are not the least intrusive means of accomplishing their claimed purpose." *See A & P Tea Co. v. Cottrell,* 424 U.S. 366, 372–373, 96 S.Ct. 923, 928–929, 47 L.Ed.2d 55 (1976); *Pike v. Bruce Church, Inc., supra,* 397 U.S. at 142, 90 S.Ct. at 847; *Dean Milk Co. v. City of Madison, Wis., supra,* 340 U.S. at 354, 71 S.Ct. at 298. According to the Trustees, the City might have promoted its interests with a lesser impact on interstate activities had the Ordinances allowed investments in companies achieving satisfactory progress ratings under the Sullivan Principles.[57] The Trustees, however, stipulated that in South Africa a number of important black organizations and leaders, including Archbishop Desmond Tutu, favor divestiture and oppose the Sullivan Principles. Furthermore, Mr. Hauck, the Trustees' expert, conceded that, in light of the political situation in South Africa, with press restrictions and the successive states of emergency, there no longer existed a "window of opportunity" for American businesses to promote changes in the apartheid system. The City was, therefore, entitled to conclude that a plan of divestment based on the Sullivan principles was insufficient.

In a separate argument the Intervenors assert that the Ordinances create a "blockage" of interstate commerce by preventing the Trustees from entering the interstate securi-

---

57. The Trustees also maintained (Brief at 50) that, by virtue of their incorporation of the Africa Fund's broad "doing business" standard, the Ordinances "represent the most instrusive divestiture scheme in the United States." We have held, however, that the Trustees are not bound by the Africa Fund's list. Consequently, we need not address this contention by the Trustees.

ties market to purchase the stocks and bonds of companies doing business in South Africa. We disagree that this "blockage" represents a cognizable burden on interstate commerce.

The Commerce Clause does not protect particular interstate firms; it protects the interstate market as a whole. As the Supreme Court stated in *Exxon Corp. v. Governor of Maryland, supra,* 437 U.S. at 127, 98 S.Ct. at 2214, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." Thus, contrary to the Intervenors' argument, the Ordinances are not invalid merely on the ground that divestiture requires the Trustees to shift the City's investments away from some interstate firms and towards others.

In light of the foregoing, we hold that the Ordinances satisfy the criteria of *Pike v. Bruce Church, Inc., supra,* and do not place an impermissible burden on interstate commerce.

(2)

As previously discussed, state conduct is undoubtedly subject to more intensive Commerce Clause scrutiny when it affects foreign as opposed to interstate commerce. *See Japan Line, Ltd. v. County of Los Angeles, supra,* 441 U.S. at 446, 99 S.Ct. at 1820; L. Tribe, *American Constitutional Law, supra,* § 6–21, at 469. Nevertheless, Congress's power over foreign commerce is not completely exclusive. As the Supreme Court stated in *Bob–Lo Excursion Co. v. Michigan,* 333 U.S. 28, 37–38, 68 S.Ct. 358, 363, 92 L.Ed. 455 (1948):

"It is far too late to maintain that the states possess no regulatory powers over such commerce. From the first meeting of Congress they have regulated important phases of both foreign and interstate commerce, particularly in relation to transportation by water, with Congress' express consent. And without such consent for nearly a hundred years they have exercised like power under the

local diversity branch of the formula announced in *Cooley v. Board of Wardens,* [53 U.S. (12 How.) 299, 13 L.Ed. 996]. See *Union Brokerage Co. v. Jensen,* 322 U.S. 202 [64 S.Ct. 967, 88 L.Ed. 1227]; *Kelly v. Washington,* 302 U.S. 1 [58 S.Ct. 87, 82 L.Ed. 3] and authorities cited in both cases. Indeed the *Cooley* criterion has been applied so frequently in cases concerning only commerce among the several states that it is often forgotten that that historic decision dealt indiscriminately with such commerce and foreign commerce."

In *Japan Line, Ltd. v. County of Los Angeles, supra,* the Supreme Court stressed that the States may not "impair federal uniformity in an area where federal uniformity is essential," 441 U.S. at 448, 99 S.Ct. at 1821, or prevent "the Federal Government from 'speaking with one voice' in international trade," 441 U.S. at 453, 99 S.Ct. at 1824.

The Trustees and Intervenors seem to argue that the United States cannot "speak with one voice" unless only one voice, that of the federal government, is allowed to speak. In *Container Corp. v. Franchise Tax Board,* 463 U.S. 159, 194, 103 S.Ct. 2933, 2955, 77 L.Ed.2d 545 (1983), however, the Supreme Court established that, even when state legislation relates to questions of foreign policy, the legislation violates the negative implications of the foreign Commerce Clause only "if it either implicates foreign policy issues which must be left to the Federal Government or violates a clear federal directive." Essentially for reasons previously set forth in this opinion, the Ordinances clearly appear to be valid under this test.

The Trustees and the Intervenors, however, contend that the Ordinances prevent the Nation from "speaking with one voice" because divestiture is likely to offend South Africa and lead it to retaliate not only against Baltimore but "against the Nation as a whole," *Container Corp., supra,* 463 U.S. at 194, 103 S.Ct. at 2955. Retaliation, they argue, is all the more likely in this case because the Ordinances are concerned with a specific foreign nation rather than foreign commerce in general.

In our view, the likelihood of retaliation would appear to be remote, given the record in this case and the absence of any clear indication from the federal government that divestment legislation interferes with the Nation's foreign policy.[58] *See also* Note, *State and Municipal Governments React Against South African Apartheid: An Assessment of the Constitutionality of the Divestment Campaign, supra,* 54 U.Cinn.L.Rev. at 563 ("Nearly twenty years after the beginning of the divestment campaign, South Africa has not evinced any intent to retaliate ... South Africa's inaction appears to validate the notion that South Africans 'will endure rather substantial economic damage before they would ... countersanction the United States.' ") Indeed, despite their far broader impact on trade between the United States and South Africa, congressional sanctions have not provoked the type of retaliation feared by the Trustees and the Intervenors. Consequently, we cannot conclude that the Ordinances "might justifiably lead to significant foreign retaliation," *Container Corp., supra,* 463 U.S. at 194, 103 S.Ct. at 2955.

Finally, we disagree with the Trustees and Intervenors that the City's voice, as expressed in the Ordinances, undermines the federal government's ability to prescribe uniform regulations governing trade with South Africa. By virtue of their moral condemnation of apartheid, the Ordinances are "broadly consistent" with federal policy towards South Africa, as embodied in the Anti-Apartheid Act. *See* Tribe Memorandum, *supra,* 132 Cong.Rec. S 12535; Lewis, *supra,* 61 Tul.L.Rev. at 502–503. Thus, although the substance of the Ordinances may differ from that of the federal statute, the underlying message of both is the same. Furthermore, as repeatedly mentioned, the federal government has not taken the position that divestment legislation interferes with the Nation's ability to achieve its foreign policy objectives.

---

**58.** The evidence before the circuit court showed that divestment has been a negligible factor in companies' decisions to leave South Africa.

For the foregoing reasons, we hold that the Baltimore City Ordinances do not violate the Commerce Clause of the United States Constitution.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY MODIFIED SO AS TO GRANT THE MOTION FOR INTERVENTION AND TO REFLECT THE VIEWS SET FORTH IN THIS OPINION, AND AS MODIFIED, AFFIRMED. IN NO. 95, COSTS TO BE PAID BY THE BOARDS OF TRUSTEES. IN NO. 104, ONE–HALF OF THE COSTS TO BE PAID BY THE APPELLANTS AND ONE–HALF OF THE COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*